UNITED STATES of America, Appellee,

v.

Michael O. MYERS, Angelo J. Errichetti, Louis Johanson, and Howard L. Criden, Defendants-Appellants.

UNITED STATES of America, Appellee,

v.

Frank THOMPSON, Jr. and John M. Murphy, Defendants-Appellants.

UNITED STATES of America, Appellee,

v.

Raymond F. LEDERER, Defendant-Appellant.

Nos. 904 to 905, 906, 907, 840, 841 and 855, Dockets 81–1342 to 81–1347 and 81–1446.

United States Court of Appeals, Second Circuit.

Argued April 5, 1982.

Decided Sept. 3, 1982.

Rehearing Denied in No. 81–1345 Nov. 17, 1982.

See also, D.C., 527 F.Supp. 1206.

Henry F. Furst, Newark, N.J. (Henry F. Furst and Raymond A. Brown, Newark, N.J., on the brief), for defendant-appellant Errichetti.

John J. Duffy, Philadelphia, Pa. (Steven H. Gifis, Alan Dexter Bowman, Princeton, N.J., on the joint brief for Myers, Errichetti, and Johanson), for defendant-appellant Johanson.

Richard Ben-Veniste, Washington, D.C. (Ben-Veniste & Shernoff, Washington, D.C., on the brief), for defendant-appellant Criden.

Timothy J. Savage, Philadelphia, Pa., for defendant-appellant Lederer.

Daniel R. Pollitt, Chapel Hill, N.C., and Frank Askin, Newark, N.J. (Neal Rutledge, Washington, D.C., on the brief), for defendant-appellant Thompson.

Michael E. Tigar, Washington, D.C. (Samuel J. Buffone, Linda Huber, Tigar, Buffone & Doyle, Washington, D.C., on the brief), for defendant-appellant Murphy.

Edward Korman, U.S. Atty., and Lawrence Sharf, Sp. Atty., Brooklyn, N.Y. (Thomas P. Puccio, Atty-in-Charge, Organized Crime Strike Force, Edward A. McDonald, Sp. Atty., Gregory J. Wallance and Vivian Shevitz, Asst. U.S. Attys., Brooklyn, N.Y., on the briefs), for appellee.

Neil Jokelson, Philadelphia, Pa. (Rochelle Newman, Jokelson & Rosen, Philadelphia, Pa., on the brief), for defendant-appellant Myers.

Before LUMBARD, FRIENDLY and NEWMAN, Circuit Judges.

NEWMAN, Circuit Judge:

In *United States v. Myers,* 635 F.2d 932 (2d Cir.), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980) (*Myers I*), we ruled that the Government had not violated the defendant's constitutional rights as a Member of Congress by requiring him to stand trial on charges of bribery arising out of an undercover "sting" operation now well known to the nation as Abscam. *See also United States v. Murphy,* 642 F.2d 699 (2d Cir. 1980). The *Myers* ruling, made in advance of trial, was based on the face of the indictment that had been returned. Now before us are appeals from judgments of conviction entered in the Eastern District of New York (George C. Pratt, Judge), after three separate jury trials in which four Congressmen and three co-defendants were found guilty of various offenses related to corruption of public office arising out of the Abscam investigation. Nos. 81–1342, 81–1343, 81–1344, and 81–1446 are appeals from convictions in the joint trial of appellants Michael O. Myers, formerly Congressman from the First District of Pennsylvania; Angelo J. Errichetti, formerly Mayor of Camden, New Jersey; Louis Johanson, formerly a member of the City Council in Philadelphia, Pennsylvania; and Howard L. Criden, a law partner of Johanson's. No. 81–1347 is an appeal from the conviction of appellant Raymond F. Lederer, formerly Congressman from the Third District of Pennsylvania, at a separate trial. Nos. 81–1345 and 81–1346 are appeals from the convictions of Frank Thompson, Jr., formerly Congressman from the Fourth District of New Jersey, and John M. Murphy, formerly Congressman from the Seventeenth District of New York, at a joint trial. Though some of the three trials present distinct issues, all seven appellants raise questions of such similarity that we have found it appropriate to consider all of the claims in one opinion. For the reasons that follow, we have concluded that all of the judgments should be affirmed on all counts, with the exception of Count Three of the indictment against Murphy, as to which we reverse and remand for a new trial.

I.

Myers, Errichetti, Johanson, and Criden were charged in a three-count indictment. Count One alleged a conspiracy in violation

of 18 U.S.C. § 371 (1976) to defraud the United States and to violate 18 U.S.C. § 201, punishing bribery and the receipt of bribes by public officials including Members of Congress. This count alleged that the conspiracy sought to defraud the United States of the Government's right (a) to the honest service of Congressman Myers "in relation to matters before the House of Representatives performed free from corruption"; (b) to have the "official action" of Congressman Myers "in attempting to influence decisions of departments and agencies of the United States in relation of matters of immigration and residence performed free from corruption"; (c) to have the immigration laws "administered honestly and impartially, free from improper and undue pressure and influence"; and (d) to have officials enforcing the immigration laws "perform their official duties free from impairment and obstruction by the exercise upon them of corrupt . . . pressure and influence." The conspiracy to violate section 201 was alleged to consist of the defendants' agreeing to demand and receive money for Congressman Myers in return for the Congressman's "being influenced in his performance of official acts."

Count Two alleged bribery in violation of 18 U.S.C. § 201(c) and § 2. This count alleged that Congressman Myers, aided and abetted by the other co-defendants, agreed to receive and received money "in return for" his "being influenced in his performance of official acts as a member of Congress, to wit, his decisions and actions in a matter involving immigration, residency and citizenship of foreign nationals which might at any time be pending or which might by law be brought before the House of Representatives and departments" of the Government. Count Three alleged that all four defendants traveled in interstate commerce to carry on the unlawful activity of bribery, in violation of 18 U.S.C. § 1952 and § 2.

The charges stemmed from an elaborate undercover "sting" operation conducted by the Federal Bureau of Investigation. Three FBI agents and a private citizen, all acting in an undercover capacity, purported to be representatives of two Middle Eastern sheiks operating a fictitious entity known as Abdul Enterprises, Ltd. The undercover operatives let it be known that their principals were interested in investing money in the United States and immigrating to this country. The core allegation against Myers and his co-defendants was that on August 22, 1979, Myers received $50,000 in return for his promise to introduce private immigration bills permitting the sheiks to remain in the United States and to take other necessary action including intervention with the State Department. A jury trial was begun on August 11, 1980, and concluded on August 29, 1980. The jury convicted all four defendants on all three counts. Errichetti and Criden were each sentenced to concurrent terms of six years' imprisonment and fines totalling $40,000. Myers and Johanson were each sentenced to concurrent terms of three years' imprisonment and fines totalling $20,000.

In a separate indictment, Lederer was charged, along with Errichetti, Johanson, and Criden, in a four-count indictment. Three of the counts paralleled the conspiracy, bribery, and interstate travel counts of the Myers' indictment. In addition, a fourth count alleged receipt of an unlawful gratuity by Lederer, in violation of 18 U.S.C. § 201(g). This count alleged that Lederer, aided and abetted by his co-defendants, agreed to receive and received money "for and because of" the performance of his official duties in a matter involving immigration of foreign nationals. The core allegation in this indictment was that on September 11, 1979, Lederer received $50,000 in return for his promise to help the sheiks with their immigration problems. Lederer's co-defendants were severed from his case after their convictions in the *Myers* case. Lederer's trial began January 5, 1981, and concluded January 9, 1981. The jury convicted Lederer on all four counts. He was sentenced to concurrent terms of three years' imprisonment and fines totalling $20,000.

In a third indictment, Thompson and Murphy were charged, along with Criden

and Joseph Silvestri, a New Jersey businessman, in a five-count indictment. Counts One, Two, and Four paralleled the conspiracy, bribery, and interstate travel counts of the Myers' indictment. Count Three charged a so-called conflict of interest, in violation of 18 U.S.C. § 203(a). This count alleged that Thompson and Murphy, aided and abetted by Criden, agreed to receive and received money "as compensation for services to be rendered before departments, agencies and officers of the executive branch of the Government" in a matter involving immigration of foreign nationals. Count Five, paralleling a count of the Lederer indictment, charged receipt of an unlawful gratuity, in violation of 18 U.S.C. § 201(g). The core allegation in this indictment was that on October 20, 1979, Murphy received $50,000, subsequently shared with Thompson, in return for their promises to help the sheiks with their immigration problems. The charges against Criden and Silvestri were severed by agreement from the charges against Thompson and Murphy. Trial (the second in the sequence of three) began on November 10, 1980, and concluded on December 3, 1980. Before the case went to the jury, Judge Pratt dismissed, as against Thompson, Count Four charging unlawful interstate travel. The jury found Thompson guilty on Counts One, Two, and Five charging conspiracy, bribery, and receipt of an unlawful gratuity; he was found not guilty on Count Three charging conflict of interest. Murphy was found guilty on Counts One, Three, and Five charging conspiracy, conflict of interest, and receipt of an unlawful gratuity; he was found not guilty on Count Two charging bribery. The jury reached no verdict on Count Four, as against Murphy, having been instructed not to consider this count unless they convicted Murphy on Count Two. Judge Pratt subsequently dismissed Count Four as against Murphy. Thompson was tentatively sentenced to the maximum allowable terms, pursuant to 18 U.S.C. § 4205(c), pending further consideration of his medical condition.[1] Murphy was sentenced to concurrent terms of three years' imprisonment and fines totalling $20,000.

In the interim between the conclusion of the three trials and the sentencing of all appellants, Judge Pratt conducted a consolidated hearing to consider various claims by all seven appellants that the Government's conduct in the Abscam investigation and in the prosecution of the charges at trial violated rights protected by the Due Process Clause of the Fifth Amendment. In considering these allegations, Judge Pratt took testimony during a 16-day "due process" hearing conducted in January and February, 1981. Judge Pratt also permitted the seven appellants to rely upon evidence pertinent to their due process claims that had been presented in other proceedings stemming from the Abscam investigation. These included the record of the trial and the "due process" hearing concerning charges against former United States Senator Harrison A. Williams, Jr., of New Jersey, in the Eastern District of New York, and the trial and "due process hearing records of charges against former Philadelphia Councilmen Harry P. Jannotti and George X. Schwartz in the Eastern District of Pennsylvania (John P. Fullam, Judge),[2] against former Congressman John W. Jenrette and a co-defendant in the District of Columbia (John G. Penn, Judge), and against former Congressman Richard Kelly and two co-defendants in the District of Columbia (William B. Bryant, Judge).[3]

---

1. Imposition of a tentative sentence pursuant to 18 U.S.C. § 4205(c) (1976) does not alter the finality of the judgment of conviction for purposes of our appellate jurisdiction. *Corey v. United States*, 375 U.S. 169, 174–76, 84 S.Ct. 298, 302–303, 11 L.Ed.2d 229 (1963) (construing predecessor statute).

2. Judge Fullam set aside the jury verdicts that had been returned against Jannotti and Schwartz, *United States v. Jannotti*, 501 F.Supp. 1182 (E.D. Pa. 1980), but on appeal the Third Circuit reinstated the verdicts, *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982) (en banc), cert. denied, —— U.S. ——, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982).

3. Judge Bryant set aside the jury verdicts that had been returned against Kelly and his co-defendants and ordered a new trial for the co-defendants. *United States v. Kelly*, 539 F.Supp.

Based upon this comprehensive record, Judge Pratt, in a detailed and thoughtful opinion, denied the due process contentions of the seven appellants as well as their multitude of other claims attacking the validity of their convictions. *United States v. Myers*, 527 F.Supp. 1206 (E.D.N.Y. 1981).

## II.

The background of the Abscam operation is described by Judge Pratt as follows:

"Abscam" is the code word given by the Federal Bureau of Investigation to an undercover "sting" operation conducted out of the FBI office at Hauppauge, Long Island, New York, under the supervision of agent John Good. Abscam began after Melvin Weinberg in 1977 was convicted in the Western District of Pennsylvania on his plea of guilty to fraud. In return for a sentence of probation Weinberg agreed to cooperate with the FBI in setting up an undercover operation similar to the London Investors, Ltd. "business" that Weinberg had used with remarkable success before his arrest and conviction in Pittsburgh.

For most of his life Weinberg had been a "con man" operating in the gray area between legitimate enterprise and crude criminality. For a number of years in the 1960s and early 1970s, he had been listed as an informant by the FBI and had provided his contact agent from time to time with intelligence about various known and suspected criminals and criminal activities in the New York metropolitan area and elsewhere, for which he had received in return occasional small payments of money. When he was arrested on the charge that led to his guilty plea, his informant status was cancelled, later to be reinstated after his guilty plea and agreement to cooperate with the FBI.

As agent-in-charge of the FBI's Long Island office Good was, at all times, the supervising agent for Abscam. Initially, Weinberg worked directly under special agent John McCarthy who later was replaced by special agent Anthony Amoro-

so. Both McCarthy and Amoroso worked undercover with Weinberg.

The general pattern of the "scam" or "sting" operation reflected Weinberg's earlier theme of representing wealthy Arab interests who had large sums of cash available for business opportunities in this country. When operating outside the law in Huntington, Long Island as London Investors, Weinberg's method had been a "front-end scam" for real estate investment wherein he would promise to obtain large loans for his victims and pick-up "appraisal" or "processing" fees of several thousand dollars, but without ever producing the final loans.

Although not identical to London Investors, the initial plan developed by Weinberg and the FBI was similar. Weinberg was to present himself as a business agent for "Abdul Enterprises", an organization backed by two extremely wealthy Arab sheiks looking for American outlets for their cash. He would pass the word of big money available for deals to other con men and people who move between the legitimate and illegitimate. If criminal proposals appeared, appropriate action would be taken by the FBI.

Weinberg and the agents set up business in an office in Holbrook, Long Island. The FBI's code name "Abscam" came from the first two letters of "Abdul", combined with the word "scam".

At first Abscam's focus was upon stolen and forged securities and stolen art work. Other "investment" opportunities soon presented themselves, and quickly the investigation turned itself toward Atlantic City and the gambling casinos which were then being proposed and constructed. As word spread about Weinberg's contact with virtually inexhaustible Arab funds, Angelo Errichetti, who was both mayor of Camden, New Jersey, and a New Jersey state senator, came on the scene. Errichetti claimed to have extraordinary influence in obtaining gambling casino licenses, power over the commissioners who issued the licenses,

363 (D.D.C. 1982), *appeal docketed,* No. 82– 1660 (D.C. Cir. June 15, 1982).

connections with organized crime, ability to deal in narcotics, guns and counterfeit securities, as well as intimate knowledge of which members of the New Jersey legislature could be bought.

Errichetti brought to the undercover agents Howard Criden, a Philadelphia lawyer seeking to promote a gambling casino in Atlantic City. In July of 1979, Errichetti and Criden met with Weinberg and Amoroso on the sheiks' yacht in Florida to discuss financing for the proposed casino that a client of Criden's wanted to build. In the course of the day Amoroso and Errichetti discussed the problem that might be faced by the sheiks should a revolution occur in their country and should they want to come to the United States as permanent residents. Amoroso told Errichetti that he thought cooperation of public officials would be needed and that money would be no problem.

Immediately after this conversation Errichetti and Criden formed an alliance in which they undertook to produce for Amoroso and Weinberg public officials who, in return for money, were willing to use their influence with the government on the sheiks' behalf. Meetings were arranged at various locations in New York, Philadelphia and Washington where the FBI monitored the proceedings with concealed videotape cameras and microphones. Where videotape was not feasible, audio recordings were used.

527 F.Supp. at 1209–10.

Once the focus of Abscam shifted to the "asylum scenario,"[4] as the parties at the trials characterized the plan to have Abdul Enterprises offer cash to public officials in return for help on immigration matters, events rapidly unfolded, leading to the incidents on which the charges against the sev-

en appellants were based. After returning to Philadelphia from the cruise on the yacht, Criden told his law partners, Johanson and Ellis Cook, that Errichetti had told him they could make substantial sums of money if they knew any Congressmen who would be willing to meet the sheik or his representatives. Cook testified for the Government under a grant of immunity. Criden reported that the money, $100,000, would be paid directly to each Congressman and then shared with the law partners. The purpose, according to Criden and Johanson, was that by meeting and paying the Congressman, the sheik would have a "friendly face," someone "that sort of owed him a favor" and would "help the sheik come into this country" and also help members of his family. Criden suggested that Johanson should contact Myers and Lederer, since Johanson knew both Congressmen. Johanson then contacted Myers and reported that Myers was willing to attend the proposed meeting.

*The Payment to Myers.* The first meeting with Myers took place on August 22, 1979, at the Travelodge International Hotel near Kennedy Airport on Long Island. Myers, Johanson, Criden, and Errichetti drove from New Jersey and Pennsylvania to the Pan American terminal at the airport, where they met for a brief conversation. As all four understood, only Myers and Errichetti were to attend the hotel meeting with the sheik's representative. Just prior to the meeting the FBI instructed Weinberg to inform Errichetti in the hotel lobby that the previously mentioned figure of $100,000 had been reduced to $50,000. Errichetti and Myers then met with Amoroso (who used the name Tony DeVito) and Weinberg in a hotel room. The meeting was recorded on videotape. Early in

---

4. There is room for dispute as to who originated what came to be called the "asylum scenario," the willingness of Abdul Enterprises to pay money to public officials in return for help with future immigration problems that the sheiks might encounter. Weinberg testified before Judge Fullam that the idea first occurred to him while on the yacht on July 26, 1979, as a result of a suggestion of Criden. Agent Amoroso testified before Judge Fullam and Judge

Pratt that he thought of the idea the previous day as a result of a newspaper article about the immigration problems of former Nicaraguan President Anastasio Somoza. The Government argued to Judge Bryant that the idea was originated by Errichetti, Criden, and Myers. At least a general reference to the idea was broached by Weinberg to George Katz, a defendant in another Abscam case, in a recorded telephone conversation held on July 14, 1979.

the conversation, Myers boasted of his influence in Congress. When Amoroso mentioned his conversation on the yacht with Errichetti concerning the sheiks' possible immigration problems, Myers replied, "Absolutely. Where I could be of help in this type of a matter, first of all, is private bills that can be introduced." Myers explained that delay was important in immigration matters and said, "[I]f I wanta keep somebody in the country, all I do is introduce a private bill." Later in the conversation, Amoroso told Myers that his employer was planning major investments in the United States, possibly including something in Philadelphia. Myers agreed with Amoroso that such an investment in his district would give him "a little protection," and added that it would provide a reason to go "full force and, ah, not that I won't otherwise," and the "perfect opportunity to raise hell before Congress." At the end of the meeting Amoroso handed Myers an envelope containing $50,000 in $100 bills. Amoroso said, "Spend it well"; Myers replied, "Pleasure."

After leaving the hotel, Errichetti met briefly with Criden at Kennedy Airport. Criden then returned to his law office in Philadelphia with the envelope Amoroso had handed to Myers. Criden reported to Cook that Errichetti had taken $15,000 for himself. Shortly thereafter Myers and Johanson arrived and conferred with Criden. Cook was then told that Myers had agreed to take only $15,000; of the remaining $20,000, Criden received $9,000 or $9,500, Johanson received $6,000 or $6,500, and Cook received $4,500.

At a subsequent meeting on January 24, 1980, at the Barclay Hotel in Philadelphia, Myers and Criden met with two other FBI undercover agents, posing as representatives of the sheiks. These agents were Michael Wald (using the name Michael Cohen) and Ernest Haridopolous (using the name Ernie Poulos). Myers vehemently complained about ending up with only $15,000, after expecting to retain $50,000 for himself out of an anticipated payment of $100,000. As Myers pointed out, "Who am I goin' to complain to ... my congressman[?]" The

undercover agents mollified Myers with an offer to pay an additional $35,000, which Myers said would be agreeable. On February 2, 1980, the date set for the additional payment, Myers was questioned at his home by FBI agents who identified themselves and said they were investigating the activities of Criden, Errichetti, Weinberg, DeVito (Amoroso), and Cohen (Wald). Myers denied knowing Weinberg, DeVito, or Cohen. The same day FBI agents interviewed Johanson. He admitted driving to Kennedy Airport for the August meeting and receiving a stack of cash. He said he realized the seriousness of this type of activity, but could not resist the chance to make easy money.

*Claims at the* Myers *Trial.* Myers acknowledged at his trial that he had retained $15,000 of the $50,000 handed to him by Amoroso. His defense, also adopted by his three co-defendants, was that all of his statements to Amoroso and Weinberg at the hotel on Long Island and to Wald and Haridopolous at the hotel in Philadelphia were what he termed "playacting." Myers, the only defendant of the four on trial to testify, claimed that Weinberg had told Errichetti, and Errichetti had told Myers, that nothing would ever have to be done for the sheiks in connection with immigration. According to Myers, Errichetti told him just prior to the August 22 meeting what he should say to impress the sheik's representatives. Myers claimed he did not intend to fulfill any of the promises he made at the meeting. Over the Government's objection, Judge Pratt instructed the jury that they should convict the defendants at the *Myers* trial of bribery only if they found that Myers was not "playacting." The jury's verdicts constitute a rejection of Myers' defense.

*The Payment to Lederer.* The initial contact with Lederer, as with Myers, was made by Johanson. He told Cook that Lederer had been briefed on the sheik's immigration problem, on the sheik's interest in investing in Philadelphia, and on the requirement that the Congressman personally receive the $50,000 being offered. Cook

testified that Lederer said he "would gladly do it for Lou [Johanson] and all he wanted was a $5,000 contribution for the spring primary." On September 11, 1979, Lederer and Errichetti met with Amoroso and Weinberg at the Hilton Inn near Kennedy Airport. The meeting was recorded on videotape. Lederer said that Errichetti had briefed him on the sheik's immigration problems. When Amoroso said, "I understand that you can introduce legislation," Lederer replied, "Right, a bill. Private bill. Sure." Lederer then raised a concern that people might ask, "Why all at once does a Philadelphia Congressman want to help somebody ...?" It would be "so much nicer," he continued, if the sheik had a "legitimate interest" in the port of Philadelphia. At the end of the meeting, Amoroso handed Lederer a bag containing $50,000 in $100 bills, commenting, "I hope you don't mind a brown paper bag with this in" and adding, "I hope you spend it well."

The next day Criden met with Cook in Philadelphia and handed him two envelopes. One, marked "RL" (Raymond Lederer), contained $5,000; the other, marked "EC" (Ellis Cook), contained $4,500. Criden told Cook that $20,000 had gone to Errichetti, $5,000 to "Mel and Tony" (Weinberg and Amoroso), and the remaining $15,500 to Criden and Johanson. Later Johanson delivered Lederer's $5,000 share to the Congressman. On February 2, 1980, Lederer was questioned by FBI agents about the September 11, 1979, meeting. He denied that Errichetti was present, that private immigration bills were discussed, and that he had received a package or a brown paper bag.

*Claims at the* Lederer *Trial.* Lederer acknowledged at his trial that he had been given $5,000 of the $50,000 handed to him by Amoroso. His sole defense was that he had been entrapped and that there was no evidence of his predisposition to commit any offenses. The jury, charged with respect to the entrapment defense, rejected it by their verdicts.

*The Payments to Thompson and Murphy.* In September, 1979, Criden met Silvestri,

the New Jersey businessman, in Florida and, knowing of Silvestri's contacts among Democratic politicians in New Jersey, inquired about Congressmen who might be willing to meet the sheik's representatives. Silvestri suggested Congressman Thompson. On October 4, Silvestri introduced Criden to Thompson, at which time Criden and Thompson spoke privately. That evening Criden told Weinberg that Thompson had agreed to assist and would meet Weinberg and Amoroso in Washington on October 9. Criden told Cook that he had made arrangements so that Thompson would not personally have to take the "package." Thompson and Criden met with Amoroso and Weinberg on the morning of October 9 at a townhouse on W Street maintained by FBI agents. The meeting was videotaped. The discussion centered on the use of private immigration bills to prevent or at least delay deportation. When Amoroso stated, "That's what the money is for," Thompson replied, "I'm not looking for any money." The discussion of private immigration bills continued. Weinberg said the sheik wanted friends he could depend on, to which Thompson replied, "I don't know how many more ways I could say it." At this time no money was transferred.

Later that day Criden returned to the W Street house for a further discussion with Weinberg and Amoroso. This meeting was videotaped. Criden complained that at the morning session Amoroso had altered their agreement, which, he claimed, called for no mention of money and Criden simply receiving a package. Weinberg and Amoroso denied making such an arrangement, stating that they were willing to have Criden take the package as long as Thompson acknowledged the money. Criden demurred, arguing that Thompson was too experienced and suspicious and could not be expected to act like Myers and Lederer. Criden agreed to talk with Thompson and telephoned to arrange a meeting with the Congressman.

On the evening of October 9, Thompson and Criden returned to the W Street house and met again with Amoroso. The meeting was videotaped. Criden said, "Frank un-

derstands the situation." Amoroso said, "There's the briefcase," pointing to a briefcase containing $50,000 in $100 bills. Thompson said to Criden, "You look after that for me will you?" Thompson and Criden then said they would bring others whom they would carefully screen. Later the group discussed possible investments of the sheik's money in New Jersey. Thompson suggested some possibilities, noting that such investments would put him in a position to justify his support of the sheik. Amoroso, recalling the morning conversation, said that they had then been "shadow boxing," to which Thompson replied, "Well, you have to be careful." Thompson said the first Congressman he might send would be his "pal" from New York, meaning Congressman Murphy. Thompson said he would "brief" his pal beforehand. As the meeting ended, Thompson and Criden both momentarily lifted the handle of the briefcase, and Criden carried it out.

The next morning Criden told Cook in Philadelphia how the $50,000 was to be divided. Thompson had taken $20,000,[5] Errichetti would receive $10,000, Silvestri, $3,500, "Mel and Tony," $5,000, and $10,000 for Criden, Johanson, and Cook, leaving $1,500 unaccounted for.

On October 10, Thompson met with Congressman Murphy in Murphy's office. After Thompson returned from a brief trip, he arranged for Murphy to meet Criden on October 19, and a meeting with the sheik's representatives was arranged for October 20. Murphy and Criden met with Amoroso and Weinberg at the Hilton Inn near Kennedy Airport on October 20. The meeting was videotaped. The discussion centered on the sheik's anticipated immigration problems. Amoroso said that his employers felt

it was worth "whatever they have to put out" to obtain assistance. Amoroso explained that his employer had said, "[T]ake the money, go find the people that can, can do this for me." Criden replied, "All you have to do is get a hold of me. I will get a hold of Jack [Murphy]." Later, Weinberg said, commenting on the apparent absence of any problem, "As long as the man says he's going to take care of it. That's what counts." Murphy answered, "Yeah." Weinberg then made clear that it would be a "different deal" if any help was needed for anyone other than the two employers that had been mentioned. "[I]n other words," Amoroso explained, "these, what we're, what we're coming up front with, the money for is just for these two guys." Murphy answered, "Yeah." At the end of the meeting Amoroso picked up a briefcase containing $50,000 in $100 bills. Criden said, "Why don't you give that to Jack." Murphy said, "Howard why don't you take care of that." [6]

On October 22, Criden, carrying the briefcase containing $50,000, met with Cook in Philadelphia and explained the expected division of the money. $25,000 would be delivered to Thompson, of which Murphy would receive $15,000; Errichetti would receive $10,000, "Mel and Tony," $5,000, and Criden, Johanson, and Cook, the remaining $10,000. Later that day Thompson telephoned Criden and arranged for Criden to meet him at a motel in New Jersey. Upon his return to Philadelphia, Criden told Cook that he had delivered the money to Thompson.

Subsequent events cast further light on the issue, seriously contested at the *Thompson-Murphy* trial, as to whether either

---

**5.** At trial the Government contended that its evidence showed that Thompson had received a portion of the money delivered at the October 9 meeting, but his violation of the bribery and unlawful gratuity statutes was based entirely on the claim that he had received a portion of the money delivered to Murphy and Criden at the October 20 meeting.

**6.** The Government contends that a close listening of the videotape reveals Murphy to have said, "Howard why don't you take care of that

for me?" The Government's transcript of the tape, shown to the jury, contained this version. Murphy's transcript, also shown to the jury, omitted the final words "for me." Our listening of the tape did not catch the words "for me," though it was surely proper to permit the jury to decide for themselves. Whether or not Murphy's line ended with "for me," the echo from the Thompson-Criden dialogue of October 9 is unmistakable.

Thompson or Murphy had received money at or as a result of the October 20 meeting. On November 8, Thompson gave Criden the name of Congressman John Murtha of the Twelfth District of Pennsylvania as a next "candidate" for the sheik's representatives. Criden passed Murtha's name along to Amoroso and Weinberg later that day at the conclusion of a meeting the three of them had with Laurence Buser, a friend of Murphy's. The purpose of this meeting was to discuss a proposed shipping deal to be financed by the sheiks in which Murphy, according to Buser, would be a "silent partner." Thompson then undertook to recruit Murtha. As Murtha testified at trial, Thompson told him, in a discussion on the floor of the House of Representatives, about the wealthy Arabs who might need assistance on immigration matters. In a second conversation with Murtha on the House floor, Thompson told Murtha that there would be $50,000 in "walking around money" for Congressmen willing to help. Thompson told Murtha he had already enlisted Murphy in the venture. Ultimately, no money was ever paid to Murtha.

On January 10, 1980, Murphy, Buser, and Criden met with Amoroso and Weinberg at the W Street house. The meeting was videotaped. The discussion concerned the proposed shipping deal, as to which Murphy said he was "not in." Later Amoroso spoke privately with Murphy. In this conversation Murphy acknowledged the dangers of speaking about money and then, in the Government's view, engaged in playacting of his own in denying receipt of any money. Murphy told Amoroso, "[A]ny time money's mentioned where a public official is mentioned, there—there's automatically an ability to link 'em to something illegal or to taking a consideration for something, uh, that he's supposed to do or use his office to do and there's, no public official would ever be involved in anything like that.... Particularly Thompson, myself, or Murtha. We'd never do anything like that. See?" Amoroso said, "[Y]ou're being coy with me." Murphy said, "Sure." Then when Amoroso said he had been reluctant to give Murphy money, Murphy said, "You didn't,

you didn't give me any money.... I never, received any money from anyone." The conversation continued with the two discussing future plans for Murphy to meet the sheik. After this meeting Murphy requested a private investigator to check out Weinberg, "DeVito," and Abdul Enterprises. Murphy said he thought they were either phonies or government agents.

On February 2, 1980, FBI agents questioned Thompson about his October 9 meeting with Amoroso and Weinberg. Thompson denied that immigration matters had been discussed and denied that anyone had received a briefcase.

*Claims at the* Thompson-Murphy *Trial.* At trial Thompson denied receiving any money. He testified that his sole purpose in going to the meetings with the sheik's representatives and arranging introductions to Murphy and Murtha was to attract investments to his and their districts. He claimed that he thought the briefcase handed to Criden at the October 9 meeting had contained investment proposals. Murphy neither testified nor presented defense witnesses at trial. His defense, as argued in summation, was that he had not received any money.

### III.

We turn first to a series of broad claims asserted, with slight variations, by some or all seven of the appellants as grounds for rejecting the lawfulness of their convictions. These are claims that in several distinct, though related, respects these convictions were obtained in violation of an outer limit of fairness guaranteed by the Due Process Clause of the Fifth Amendment to all persons whenever the Government of the United States acts to detect and prosecute criminal activity. Some of the claims are reenforced by the contention that the Abscam investigation and prosecution of Congressmen, and those charged with aiding and abetting them and conspiring with them, also violated constitutional protections of Members of Congress, either contained explicitly in the Speech or Debate

Clause, U.S. Const. art. I, § 6, or implicitly in the doctrine of separation of powers.

## A. Lack of Prior Suspicion.

Appellants contend that it is unconstitutional for the Executive Branch of the Government to predicate the conviction of a Member of Congress upon a criminal opportunity created by agents of the Executive Branch, in the absence of probable cause, or perhaps some lesser standard of suspicion, to believe that the Congressman has previously engaged in criminal activity. The argument emphasizes the risk of abuse: if the practice is permitted, it might be directed at Congressional targets selected for political reasons, and such political targeting, though violating the First Amendment, *see United States v. Steele,* 461 F.2d 1148, 1151 (9th Cir. 1972), would be difficult to establish and therefore too readily available for use by malevolent officials.[7] The argument also suggests that it is simply not the constitutional business of the Executive Branch to test the virtue of Members of a coordinate branch of government.

In *Myers I* we canvassed the considerations supporting and opposing this claim and concluded that while the claim raised important issues of public policy appropriate for the attention of the Executive and Legislative Branches, it did not present a court with a ground for declaring that the Constitution had been violated, 635 F.2d at 938–39. Our reflection upon the issue has been deepened by the passage of time and focused more sharply by the vast record assembled on these appeals, but our conclusion has not been altered. The Constitution permits Congress to apply the criminal law enforcement process to a Member's acceptance of a bribe. *United States v. Brewster,* 408 U.S. 501, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972). A Congressman is as entitled as any other citizen to the constitutional and statutory protections that limit the power of the Government to investigate and prosecute criminal offenses. But, with the exception of section 6 of Article I, which explicitly affords immunity to Senators and Congressmen "for any Speech or Debate in either House" and privilege from arrest for most criminal offenses during attendance at sessions of Congress, the Constitution does not provide Members of the Legislative Branch with any extra protections beyond those guaranteed to all citizens. Specifically, Members of Congress enjoy no special constitutional rule that requires prior suspicion of criminal activity before they may be confronted with a governmentally created opportunity to commit a crime.

What is available in such circumstances is the traditional defense of entrapment, which prevents conviction of a person induced to commit a crime unless the prosecution can establish the person's predisposition to commit the crime. *See Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). The entrapment defense exonerates a defendant who engages in criminal behavior when the activity of government agents "implant[s] in the mind of an innocent person the disposition to commit the alleged offense and induce[s] its commission," *Sorrells v. United States, supra,* 287 U.S. at 442, 53 S.Ct. at 212. But the defense of entrapment is not established simply because government agents "afford opportunities or facilities for the commission of the offense," *Sorrells v. United States, supra,* 287 U.S. at 441, 53 S.Ct. at 212, or engage in "deceit," *United States v. Russell,* 411 U.S. 423, 435–36, 93 S.Ct. 1637, 1644–45, 36 L.Ed.2d 366 (1973). The legal defense of entrapment is not established whenever a defendant is caught by a ruse.

Although the defense of entrapment was available to all seven appellants, none ex-

---

7. Several appellants in fact contend that in these cases the Government targeted the defendant Congressmen for political or other impermissible reasons. This claim is flatly contradicted by the evidence. The Government had no role whatever in the selection of any of the four Congressmen involved in these appeals. Criden and Johanson selected Congressmen Myers and Lederer. Silvestri selected Congressmen Thompson. Thompson selected Congressman Murphy.

cept Lederer elected to assert the defense at trial, or request a jury instruction on the issue. The defendants in the *Myers* and *Thompson-Murphy* trials made no attempt to avail themselves of the limited opportunity a defendant has to defend on the dual grounds of non-involvement and entrapment, *see United States v. Valencia*, 645 F.2d 1158, 1170–72 (2d Cir. 1980) (amended 1981). They claimed only that bribery had not occurred, the *Myers* defendants on the ground that Myers was only "playacting,"— pretending to promise official action—and Thompson and Murphy on the ground that proof was lacking that they had accepted money for promises of official action. We do not doubt that when an entrapment defense is raised by evidence of inducement, either through cross-examination or affirmative evidence, a defendant is entitled to have a court assess, as with every other element of an offense, whether the record contains sufficient evidence from which a reasonable jury can conclude beyond a reasonable doubt, *United States v. Taylor*, 464 F.2d 240, 243 (2d Cir. 1972), that the prosecution has proved the defendant's predisposition to commit the offense. *See United States v. Valencia, supra*, 645 F.2d at 1167–68 (evidence of predisposition sufficient to create issue for jury). But a defendant is not entitled to a court ruling on the minimal sufficiency of the prosecution's evidence as to a defense that the accused has not placed in issue. A defendant's failure to assert an entrapment defense prevents the prosecution from responding to evidence of inducement by presenting evidence of the defendant's predisposition to commit the crime. We hold that a defendant who fails to assert entrapment as a factual defense at his trial, cannot assert it as a legal defense to his conviction. *See United States v. Bishop*, 367 F.2d 806, 809–10 (2d Cir. 1966).

■ Although Lederer, having asserted the defense of entrapment at trial, can challenge the sufficiency of the evidence of his predisposition, his claim is without merit. In seeking only $5,000 for himself out of the $50,000 he received, Lederer displayed neither the greed of Myers nor the guile of Thompson and Murphy; nevertheless, the evidence at his trial fully entitled the jury to find his predisposition beyond a reasonable doubt. Predisposition may be established by "the accused's ready response to the inducement," *United States v. Viviano*, 437 F.2d 295, 299 (2d Cir.), *cert. denied*, 402 U.S. 983, 91 S.Ct. 1659, 29 L.Ed.2d 149 (1971); *United States v. Becker*, 62 F.2d 1007, 1008 (2d Cir. 1933). The videotape of the September 11 meeting reveals Lederer responding with alacrity. As he assured the sheik's representatives, "I'm not a Boy Scout."

### B. Excessive Government Role.

Appellants contend that even if the traditional entrapment defense fails, whether factually in Lederer's case or procedurally as to the other appellants, the conduct of Abscam violated standards of due process because the Government's role in the investigation was excessive and fundamentally unfair. Unlike the entrapment defense, which focuses on the defendant's predisposition, this due process claim focuses on the conduct of the government agents.[8] There are several strands to the argument. First, it is urged, the Government created the crimes. The elaborate contrivance of Abscam is claimed to extend beyond the legitimate role of law enforcement in detecting crime into a forbidden area of instigating crime. Second, the appellants contend that the inducements offered to the Congressmen for their corrupt promises of official action were so excessive that a court should

---

**8.** *The appellants sometimes refer to this claim as "entrapment as a matter of law." We prefer to characterize it as a due process claim, leaving the phrase "entrapment as a matter of law" to describe the claim that, with respect to a traditional defense of entrapment, the evidence of predisposition was insufficient as a matter of law to permit the jury to find that the prosecu-* tion had proved predisposition as a matter of fact. Unlike the claim of entrapment as a matter of law, the due process claim of excessive governmental inducement is available to a defendant whether or not he asserted an entrapment defense at trial, since this claim is independent of evidence concerning predisposition.

declare them to exceed limits claimed to inhere in the Due Process Clause. Third, appellants in the *Myers* case contend that the Government agents, notably Weinberg, "coached" Congressman Myers into committing the crimes by having Errichetti and Criden tell Myers what to say at the videotaped meetings and simultaneously assuring him that he need not intend to keep the promises he was making since he would never be called upon to deliver.

In assessing this collection of claims, we acknowledge the intimations in decisions of the Supreme Court and this Court that the due process requirement of fundamental fairness may have a special pertinence when Government creates opportunities for criminal conduct in order to apprehend those willing to commit crimes. *See Hampton v. United States,* 425 U.S. 484, 491–95, 96 S.Ct. 1646, 1650–52, 48 L.Ed.2d 113 (1976) (Powell, J., concurring); *United States v. Russell, supra,* 411 U.S. at 431–32, 93 S.Ct. at 1642–43; *United States v. Archer,* 486 F.2d 670, 676–77 (2d Cir. 1973); *see also Archer v. Commissioner of Corrections,* 646 F.2d 44, 46–47 (2d Cir.), *cert. denied,* 454 U.S. 851, 102 S.Ct. 291, 70 L.Ed.2d 141 (1981) (*Archer II*). At the same time, we recognize that, with the exception of a decision by a divided panel of the Third Circuit, *United States v. Twigg,* 588 F.2d 373 (3d Cir. 1978), convictions have not been invalidated by federal appellate courts on grounds of excessive government involvement after the decisions of the Supreme Court in *Russell* and *Hampton* narrowed the availability of this defense. As the decisive concurring opinion of Justice Powell in *Hampton* stated, "Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction." 425 U.S. at 495 n. 7, 96 S.Ct. at 1652 n. 7. Our own decision in *Archer II,* though questioning an extreme example of governmental initiation of a criminal opportunity, if not the crime itself, rejected the due process claim. 646 F.2d at 47. Moreover, as we recently observed in

*United States v. Alexandro,* 675 F.2d 34 (2d Cir. 1982), an Abscam conviction of an employee of the Immigration and Naturalization Service, the due process claim, in the rare instances when successful, has prevailed to restrain law enforcement activities that involve coercion, *e.g., Watts v. Indiana,* 338 U.S. 49, 69 S.Ct. 1347, 93 L.Ed. 1801 (1949), or outrageous violation of physical integrity, *e.g., Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952).

■ 1. *Instigation.* The appellants' claim of excessive governmental involvement in the instigation of criminal conduct is not supported by the facts. Though the "sting" was surely elaborate, its essential characteristic was the creation of an opportunity for the commission of crime by those willing to do so. The Government produced people with fictitious identities ready to pay bribes to Congressmen. Word of the availability of bribe money was made known. From that point on, the essential conduct of the agents and their paid informant was to see who showed up to take the bribes and videotape them in the act of doing so.[9] Whatever may be the due process limit of governmental participation in crime, it was not reached here. *See Hampton v. United States, supra; United States v. Russell, supra; United States v. Jannotti,* 673 F.2d 578 (3d Cir.) (*en banc*), *cert. denied,* —— U.S. ——, 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. McQuin,* 612 F.2d 1193, 1196 (9th Cir.), *cert. denied,* 445 U.S. 954, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980); *United States v. Quintana,* 508 F.2d 867, 876–78 (7th Cir. 1975).

2. *Inducement.* Appellants contend that the size of the inducements offered to the Congressmen was excessive. They refer not to the $50,000 amounts of the bribes, but to the offers of financing multi-million dollar projects in the Congressmen's districts. We have considerable difficulty with the premise of this argument, which is that a Congressman is privileged to take a

---

**9.** As Judge Pratt pointed out, Murphy's conduct is more accurately described as the taking of money, rather than a bribe, since the jury acquitted him of the bribery offense and convicted him of accepting an unlawful gratuity. 527 F.Supp. at 1225 n. 14.

$50,000 bribe so long as he simultaneously believes he is bringing the benefits of investments to his district. The argument is an affront to all the law-abiding Members of Congress and state officials who consider it a normal part of their public responsibilities to promote business activity for the benefit of their constituents. Moreover, if appellants are contending that there are due process limits on the size of an inducement that a government agency may offer and condition on acceptance of a bribe, the facts of these cases belie the fanciful image of four Congressmen so anxious to bring investment benefits to their districts that they reluctantly accept bribes on which they thought the investments were conditioned. Quite to the contrary, the evidence shows four Congressmen jumping at the chance to take a bribe and discussing investments in their districts as a convenient cover to justify their rendering of purchased legislative services. As Thompson said, anticipating possible criticism for helping the sheik, "I'm in a position to say well of course I'm helping this guy. Why shouldn't I help this guy . . . his money is helping my guys work everyday." Myers put it more bluntly: an investment in the district "gives me a little protection."

Thompson contends that inducement in violation of due process limits occurred in his case because the agents persisted in offering money after his initial rejection on the morning of October 9, 1979. The claim is spurious. At the morning meeting Thompson did not reject a bribe, he rejected its payment under circumstances he feared would be incriminating. Then in the afternoon Criden met first with Amoroso and Weinberg and later with Thompson. At the meeting on the evening of October 9, what occurred was not unfair inducement, but simply the offering of money pursuant to an arrangement developed by Thompson and Criden whereby the bribe could be accepted while preserving what Thompson mistakenly thought would be deniability.

3. *"Coaching."* Appellants in the *Myers* case claim that excessive governmental activity, breaching due process limits, is to be found in the alleged conduct of Weinberg in "coaching" Myers to say falsely that he would introduce private immigration bills while assuring him that he would not be called upon to deliver on his promises. The claim is that Weinberg gave Errichetti and Criden the script for a charade that Myers would enact before the television cameras, and Errichetti and Criden then instructed Myers, in effect, how to obtain money under false pretenses.

In the District Court, Judge Pratt accepted, for purposes of these trials, the legal sufficiency of the "playacting" defense,[10] and afforded the defendants in the *Myers* case wide latitude to present evidence in support of their claim. He then submitted the claim to the jury, under an instruction that the jury was not to convict unless the Government proved beyond a reasonable doubt that a Congressman who had accepted money in return for a promise to introduce immigration bills had done so with the intention of carrying out that promise. In other words, the jury was to acquit on the bribery charge if they accepted the "playacting" defense. The *Myers* jury obviously rejected the defense, and, on the evidence before them, they were certainly entitled to do so. Despite the existence of some evidence that Weinberg, through Errichetti and Criden, had encouraged the Congressmen to "come on strong," as Weinberg acknowledged in his testimony at the *Myers* trial, the jury was entitled to conclude that this was no charade. An entirely plausible inference even from the defendants' evidence, and the one the jury apparently accepted, is that Weinberg was not urging the Congressmen to utter promises they were reluctant to make and did not intend to keep, but was simply anxious to make sure that they fully and unambiguously expressed on videotape the promises they

10. We suspect that this ruling reflects the not uncommon practice of district judges, faced with a defense claim of questionable legal validity in the course of protracted proceedings, to err on the side of caution and permit the defense to make its factual claim to a jury, rather than risk a reversal and retrial.

were all too ready to make and fully intended to keep.

■ Moreover, after the trials were concluded, Judge Pratt afforded the defendants a full opportunity at the "due process" hearing to amplify the record to persuade him, as the trier of fact on the due process claim, that only a charade had occurred. After conducting a wide-ranging hearing, the District Judge found the claim unsupported as a factual matter, and his findings are not clearly erroneous.

However, circumstances in the record prompt us not to place this portion of our decision solely on the traditional deference an appellate court extends to the fact-finding of a jury and a trial judge when supported by sufficient evidence. The record contains one striking instance, in the early stages of Abscam, when Weinberg unquestionably pursued a course of conduct with Senator Williams that reveals precisely the sort of "coaching" for "playacting" that some of these appellants claim occurred with them.[11] In a recorded conversation with Senator Williams on June 28, 1979, Weinberg made these statements:

> He's only interested in you. You gotta tell him how important you are, who you are, what you can do and you tell him in no uncertain terms "without me there is no deal." "I'm the man. I'm the man who's gonna open the doors. I'm the man who' gonna do this and use my influence and I guarantee this." Follow me? All bullshit.
>
> . . . .
>
> And that's it, it goes no further, it's all talk, all bullshit. That's all he wants to hear it.
>
> . . . .
>
> It's ... it's a walk-through. You should be out of there in twenty minutes.

11. We intimate no opinion with respect to the effect of this episode on Senator Williams' appeal from his conviction.

12. Judge Pratt concluded that both Plaza and another Assistant United States Attorney from New Jersey, Edward Weir, were motivated to criticize the Abscam operation by jealousy over the control by prosecutors from the Eastern

. . . .

> Come on, "Me, I'm the power." And that's it. It's as simple as that. You're on stage for twenty minutes.
>
> . . . .
>
> So you ready to go on stage?

When this "coaching" session came to the attention of the office of the United States Attorney for the District of New Jersey, prosecutors there strenuously protested Weinberg's conduct and complained to Department of Justice officials and the prosecutors in charge of Abscam in the Eastern District of New York. That protest led to a meeting on August 9, 1979, at the home of Special Agent Larry Schneider of the FBI office in New Jersey, attended by Weinberg, prosecutors from the Eastern District of New York and the District of New Jersey, and FBI agents. What was said at that meeting was a matter of dispute at the due process hearing before Judge Pratt. FBI agent Martin Houlihan recounted an exchange between Edward Plaza, then an Assistant United States Attorney in New Jersey,[12] and Weinberg. According to Houlihan, Plaza told Weinberg that he could not put words into people's mouths; Weinberg replied "to the effect that if he didn't say things like that, then we wouldn't be making any cases." Agent Schneider supported Houlihan's account with the following testimony: at a meeting a few days later with Thomas P. Puccio, attorney in charge of the Organized Crime Strike Force in the Eastern District, Weinberg denied ever saying that he had "to put words in people's mouths or we won't make any cases," to which Schneider and Houlihan promptly replied, in substance, "Mel, that's not so, you did say that."

Schneider also testified that, when the Williams' "coaching" session was discussed

District of New York of an investigation uncovering corruption in the District of New Jersey. 527 F.Supp. at 1245–47. Professional rivalry may have been afoot, but our review of the record inclines us to think that Plaza and Weir were expressing in good faith concerns based largely on their sense of the proper administration of justice.

at the August 9 meeting and Weinberg was admonished to refrain from such conduct, he (Schneider) made "a statement to the effect 'Yeah, at least if you're going to coach him you don't tape it.'" At the hearing, Schneider characterized this as a "joking remark," which "was said in a joking matter, as far as I understood everybody understood it to be a joking matter." To put it mildly, this is an odd subject for humorous bantering.

Not having heard the participants who testified about the August 9 meeting, we are in no position to assess credibility and decide whether Weinberg made the remark attributed to him. We note that Judge Pratt's discussion of the August 9 meeting does not make a finding of fact on this point. 527 F.Supp. at 1235. Judge Pratt did find that, by the time of the August 9 meeting, the Williams "coaching" incident was "past history, and the technique was not thereafter repeated." *Id.* This finding relates to whether Weinberg himself did any "coaching" of the Congressmen. It does not preclude the distinct possibility that Weinberg encouraged Errichetti and Criden to handle the "coaching" for him. Judge Pratt expressed the view that, if this happened, the Government bore no responsibility for whatever Errichetti and Criden

might have told the Congressmen. *Id.* at 1735–37. If impropriety of constitutional dimension had arisen from Weinberg's "coaching," we would not be so certain as Judge Pratt that the taint would be dissipated by transmission through middle-men. *See United States v. Valencia, supra,* 645 F.2d at 1168–72; Note, *Entrapment Through Unsuspecting Middlemen,* 95 Harv. L. Rev. 1122 (1982).[13] There is a substantial risk that Weinberg, having been admonished for "coaching" Senator Williams, and, even on the Government's version, having heard FBI agents and prosecutors "joke" about his not taping further "coaching" sessions, did decide to encourage Errichetti and Criden to undertake similar "coaching" ventures with the Congressmen.[14] Since we are left with at least a measure of unease as to whether some indirect "coaching" occurred, we prefer to consider the substance of appellants' claim.

■ (3)a. *"Coaching" and the "Playacting" Defense.* The appellants' "coaching" claim seeks to create a due process violation by combining an erroneous interpretation of the bribery statute with an unrealistic assessment of the facts. The first step in the argument is taken when the appellants contend that "playacting" is a defense to brib-

13. Although there is room for fair dispute as to the circumstances in which government may be held responsible for entrapment by a third party, *see United States v. Valencia,* 645 F.2d 1158, 1176 (2d Cir. 1981) (Van Graafeiland, J., dissenting from denial of rehearing en banc), "the defense is available, of course, where government agents act through private citizens," *United States v. Buie,* 407 F.2d 905, 908 (2d Cir.), *aff'd on other grounds sub nom. Minor v. United States,* 396 U.S. 87, 90 S.Ct. 284, 24 L.Ed.2d 283 (1969); *see Lopez v. United States,* 373 U.S. 427, 83 S.Ct. 1381, 10 L.Ed.2d 462 (1963); *Johnson v. United States,* 317 F.2d 127, 128 (D.C. Cir. 1963). Appellants' claim of indirect "coaching" presents the strongest circumstance for attributing third-party conduct to a government agent, since this is a claim of what might be called "instructed transmission" of an inducement: Weinberg, acting as agent for the Government, allegedly gave "coaching" directions to middlemen Errichetti and Criden with specific instructions that they should relay his directions to the Congressmen. The justification for holding government accountable for a middleman's behavior would be less compel-

ling if the claim were one of "uninstructed transmission": a middleman takes it upon himself to pass an agent's inducement along to others. Government responsibility has been rejected where the circumstances showed what might be called "caused" inducement: an agent induces a middleman to commit a crime, and the middleman, responding to the pressure upon him, takes it upon himself to induce another person to participate in the crime. *E.g., United States v. Reed,* 526 F.2d 740 (2d Cir. 1975), *cert. denied,* 424 U.S. 956, 96 S.Ct. 1431, 47 L.Ed.2d 361 (1976). *See generally United States v. Valencia, supra,* 645 F.2d at 1178 (explication of *Reed* facts).

14. At the Philadelphia due process hearing before Judge Fullam, Errichetti and Criden, testifying under an arrangement that precluded use of their testimony against them, both alleged that, acting at Weinberg's behest, they had told the Congressmen that money could be obtained simply by pretending to give assurances of using Congressional influence.

ery. It is not.[15] Since Myers appears to be the first public official in a reported federal decision to defend a bribery charge on the ground that he intended to keep the bribe but not to keep the promise he made to the bribe-payer,[16] it is not surprising that the appellate reports have not dealt explicitly with the claim. The statute proscribes the corrupt receipt of money by a public official "in return for: (1) being influenced in his performance of any official act . . . ." The phrase "in return for" appeared in the statute in 1962 when Congress revised and consolidated various public corruption statutes. This phrase makes it clear that bribery under section 201(c) requires a promise of a future act in exchange for the money given to the public official, an element not required for receipt of an unlawful gratuity under section 201(g), which punishes receipt of a gratuity paid "for or because of" performance of a future or past official act. *United States v. Niederberger,* 580 F.2d 63, 68–69 (3d Cir.), *cert. denied,* 439 U.S. 980, 99 S.Ct. 567, 58 L.Ed.2d 651 (1978); *United States v. Brewster,* 506 F.2d 62, 71–72 (D.C. Cir. 1974). As the Supreme Court said in *United States v. Brewster, supra,* 408 U.S. at 526, 92 S.Ct. at 2544, construing the bribery statute, "[t]he illegal conduct is taking or agreeing to take money for a promise to act in a certain way." But the text of the 1962 revision perpetuates the preexisting ambiguity as to whether the promise given by the public official must be one that he intends to carry out. A prior statute, 18 U.S.C. § 205 (1958), had required that a Congressman receive the bribe "with the intent to have his action . . . influenced." This somewhat awkward phrasing

left it unclear whether the Congressman must intend to take action or need only intend to receive money with awareness of the purpose for which the briber gives it.

The present version, as revised in 1962, deletes "intent" from the description of the conduct specifically proscribed, and instead requires that the overall offense be committed "corruptly." The specific conduct is rephrased as receipt of money in return for "being influenced" in official actions. The meaning of the new language (and probably that of the prior language as well) is clarified by the report of the House Committee on the Judiciary:

> The language used in subsection (c) [of section 201] emphasizes that it is the purpose for which the recipient knows the bribe is offered or given when he solicits, receives, or agrees to receive it which is determinative of criminality. Some courts have given this interpretation to the present section 202.[17] (See, e.g., *Woelfel v. United States,* 237 F.2d 484, 488 [4th Cir.]; *Whitney v. United States,* 99 F.2d 327, 331 [10th Cir.].)

H.R. Rep. No. 748, 87th Cong., 1st Sess. 18 (1961). Thus, "being influenced" does not describe the Congressman's true intent, it describes the intention he conveys to the briber in exchange for the bribe. The citation in the House Report to the *Whitney* decision underscores the point. On the page of the *Federal Reporter* to which the Report refers appear these sentences (and no others of consequence):

> The evidence shows that [the public official] not only took but solicited money in

---

**15.** Appellants have no basis for complaint because Judge Pratt gave them an opportunity, accepted by defendants in the *Myers* trial, to try to persuade the jury that the facts supported a defense to which they were not entitled.

**16.** Cases have considered and rejected the somewhat similar defense that the bribe-taker was unable to be influenced because the official act for which the bribe was paid either was beyond his authority, *see, e.g., United States v. Carson,* 464 F.2d 424, 433 (2d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972); *United States v. Heffler,* 402 F.2d 924

(3d Cir. 1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1280, 22 L.Ed.2d 480 (1969), or had already been taken, *see e.g., United States v. Arroyo,* 581 F.2d 649, 653–57 (7th Cir. 1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 838, 59 L.Ed.2d 34 (1979).

**17.** Section 202 of Title 18, as it read before the 1962 revision, proscribed acceptance of bribes by various officials of the United States. Using language similar to former section 205, covering receipt of bribes by Members of Congress, section 202 proscribed receipt "with intent to have his decision or action . . . influenced thereby." 18 U.S.C. § 202 (1958).

connection with said sales, and whether his action was influenced is immaterial. The money was solicited and taken for the purpose of causing [the people who paid the bribe] to believe that they would get more consideration than they would otherwise.

*Whitney v. United States,* 99 F.2d 327, 331 (10th Cir. 1938). As the Seventh Circuit has said, in rejecting a claim that a bribe was not received in return for being influenced because the event requiring influence had already occurred, "The phrase ['in return for'] brings into play the purpose of the bribe and thus the mind of the bribe-payer." *United States v. Arroyo,* 581 F.2d 649, 654 (7th Cir. 1978), *cert. denied,* 439 U.S. 1069, 99 S.Ct. 838, 59 L.Ed.2d 34 (1979). Construing a similar statute proscribing receipt of money for the promise of a public office, 18 U.S.C. § 215 (1952) (a predecessor of 18 U.S.C. § 201 (1976)), the Supreme Court upheld a conviction despite the fact that the public office, though authorized, was not in existence. *United States v. Hood,* 343 U.S. 148, 72 S.Ct. 568, 96 L.Ed. 846 (1952). "Whether the corrupt transaction would or could ever be performed is immaterial. We find no basis for allowing a breach of warranty to be a defense to corruption." *Id.* at 151, 72 S.Ct. at 569. With respect to the bribery statute, we believe the defense of fraud is equally unavailable.[18] If Myers was "playacting" and giving false promises of assistance to people he believed were offering him money to influence his official actions, he violated the bribery statute.[19]

3(b). *"Coaching" as Inducement.* With the statute thus understood, the "coaching" claim does not provide a legal defense simply because some "coaching" may have occurred; the claim would have merit only if there were insufficient evidence of the defendants' predisposition to "playact" or if the agents' conduct were so extreme as to exceed due process limits. We have already ruled that the entrapment defense is without merit in Lederer's case and is procedurally unavailable to the other appellants because they elected not to assert it at trial. The entrapment defense fares no better when the appellants shift their focus from the size of the inducements to Weinberg's alleged suggestion of a script. Prompt acquiescence shows predisposition to accept a bribe, whether or not a promise of official action is intended to be kept.

Thus, appellants are left with a claim that the "coaching" was so outrageously coercive as to violate due process, wholly apart from the traditional defense of entrapment. The record does not remotely support the claim. Even if all of the appellants' evidence is credited, a generous assumption that strains credulity, it shows at most that Errichetti and Criden, perhaps prompted by Weinberg, laid out before each Congressman a scheme for pocketing $50,000 by falsely promising to introduce private immigration bills. Suggesting how easy it is to commit a crime hardly establishes a due process violation. The "coaching," if it occurred, barely qualifies as any

---

18. This construction of the statute is especially appropriate when the public officials who receive bribes are Members of Congress, since the Speech or Debate Clause bars evidence of their subsequent official action or the reasons for it, *United States v. Johnson,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966), evidence that would frequently be highly probative of whether, at the time of the bribe, the Member intended to take official action. It is unlikely that Congress, aware of the special protection its Members enjoy under the Speech or Debate Clause, included in the offense of bribery an element for which the Clause insulates the pertinent evidence.

19. We recognize that some opinions have described the bribery statute in language that can be read to suggest that the bribe-taker must intend to take the promised official action. *See United States v. Brewster,* 506 F.2d 62, 70–76 (D.C. Cir. 1974); *United States v. Irwin,* 354 F.2d 192, 195–96 (2d Cir. 1965), *cert. denied,* 383 U.S. 967, 86 S.Ct. 1272, 16 L.Ed.2d 308 (1966). We do not give controlling weight to such dicta, since they were expressed without any need to consider the bizarre defense that the bribe-taker did not intend to keep his corrupt promise. Consequently, the opinions had no occasion to discuss the 1962 House Judiciary Committee Report, which is so pertinent to the claim in this case.

inducement at all; if the script was supplied, no one was coerced into playing his part. Due process challenges to an undercover agent's encouragement have been rejected when one defendant was solicited twenty times before committing an offense, *United States v. Esquer-Gamez,* 550 F.2d 1231 (9th Cir. 1977), and when another defendant was tempted by a million-dollar cash deal and prodded by veiled threats, *United States v. Reynoso-Ulloa,* 548 F.2d 1329 (9th Cir. 1977), *cert. denied,* 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978). Whatever conduct might transgress the standard outlined in *Hampton* and *Russell,* the facts of the Abscam investigation are not even close to the line. *United States v. Alexandro, supra; United States v. Janotti, supra.* The bare suggestion to a Congressman that he take a bribe, even for a promise he need only pretend to make, surely does not violate a constitutional standard of "outrageous" behavior. The public has the right to expect that their public officials have sufficient integrity not to capitulate at such a suggestion. Whatever the public's expectation, the record reveals that these Congressmen were not children of Hamelin, seduced by the piping of Melvin Weinberg.

C. Impairment of Accurate Fact-Finding.

Appellants allege that the conduct of the Abscam investigation denied them due process for a variety of reasons that are combined in support of a broad claim that the Government prevented the presentation to the jury of an accurate account of the events. With the exception of traditional arguments that exculpatory evidence was withheld in violation of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the due process foundation of this general area of attack is more the product of resourceful argument than precedent. To be successful, this attack must overcome our well-established reluctance to dismiss criminal prosecutions because of faulty Government investigation. *See United States v. Brown,* 602 F.2d 1073 (2d Cir.), *cert. denied,* 444 U.S. 952, 100 S.Ct. 427, 62 L.Ed.2d 323 (1979); cases cited *id.* at 1076–

77. It might be thought that the specific constitutional guarantees concerning criminal procedure, *e.g.,* the Confrontation Clause of the Sixth Amendment, and the Federal Rules of Evidence provide sufficient standards for determining the quality of evidence appropriate to support a finding of guilt. Yet the Due Process Clause, with its principle of constitutionally required fairness, has been applied to develop minimum standards concerning the accuracy of evidence, notably in the area of eyewitness identification testimony. *See Manson v. Braithwaite,* 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977); *Stovall v. Denno,* 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967). Appellants invite us to frame comparable standards for undercover investigations.

1. *Deliberate Ambiguity.* An interesting component of the argument, advanced by Thompson and Murphy, maintains that when the Government is in control of an undercover operation, as contrasted with merely observing events in which no governmental agent is involved, due process requires the investigators to eliminate or at least minimize ambiguities in the critical events that form the basis of the criminal offense. Otherwise, they contend, the Government needlessly creates risk of erroneous fact-finding by the jury on the ultimate issue of guilt or innocence. Relating the claim to these cases, they argue that an undercover offer of a bribe must be expressed in terms that leave no uncertainty that money is being transferred to a Congressman and that it is being paid to influence his official actions. As counsel for Murphy contends, "Congressman Murphy was denied the opportunity to say 'no,' [*see Myers I, supra,* 635 F.2d at 939] because the Government did not clearly convey its invitation to corruption." (Murphy Br. 50.)

Perhaps at some point deliberate governmental efforts to render ambiguous events over which agents can exercise considerable control would transgress due process limits of fundamental fairness. Wherever those limits might be, they have not been crossed in these cases. Undercover agents offering

bribes to Congressmen are entitled to simulate the guarded conversation that would be expected of those proposing an unlawful venture. *Cf. United States v. Reynoso-Ulloa, supra,* 548 F.2d at 1338–39. They need not say, "Congressman, I have here a cash bribe to be exchanged for your corrupt promise to be influenced in your official action."

In the *Myers* and *Lederer* cases, the bribe offers created no risk of ambiguity. There were ample references to money and to its payment in exchange for assistance with private immigration bills, and both Myers and Lederer directly received envelopes filled with cash under circumstances leaving no doubt as to their knowledge of the contents. The episodes involving payments to Thompson on October 9 and to Murphy on October 20 are somewhat more ambiguous. Although the events and conversations at those meetings are captured on videotape, the sights and sounds, considered in isolation, create fair questions of fact as to whether Thompson and Murphy knew that money was in the briefcase, and whether the money was received by the Congressmen. Both Congressmen contend that they did not know that the briefcase contained cash and that on both occasions Criden received the briefcase and did not share its contents with either Thompson or Murphy.

Whatever ambiguity arises from the manner in which the bribes were offered at the meetings on the evening of October 9 and on October 20 is directly attributable to the cautious ground rules insisted upon by Criden and Thompson in the hope of insulating Thompson and those he recruited from culpability. It is plainly inferable from the taped conversations of the three meetings on October 9 that Thompson arranged to have the cash transferred without explicit references to it, apparently in the forlorn hope that if any of his trusted companions ever appeared on a witness stand to accuse him, he could escape conviction by recounting how he had told the group that he did not want cash and had left the meeting without any money. The permissible, if not the irresistible, inference

the jury could draw from the series of conversations on October 9 was that Thompson was not rejecting money; he was carefully orchestrating how to accept it with feigned innocence. The evidence supported a finding that Thompson and Criden, recognizing that those offering bribes understandably want some indication that the Congressman they have bought it aware of the purchase, worked out a scenario whereby Thompson would acknowledge receipt with only the oblique comment to Criden, "You look after that for me will you?" That formula, the jury could find, would surely satisfy the bribe-givers that Thompson was acknowledging receipt, while preserving his opportunity, if the occasion ever arose, to claim at a trial, as he did, that he thought the briefcase contained investment proposals.

■ The transaction on October 20, which formed the basis for the substantive offenses of which both Thompson and Murphy were convicted, followed the same pattern Criden and Thompson had developed and used for the evening session on October 9. The evidence shows that Thompson and Criden had explained their ground rules to Murphy. A recorded telephone conversation between Criden and Weinberg on October 17 contained these passages:

Weinberg: Now, you gonna lay those ground rules to Murph, right?

Criden: Oh yeah. No problem.

. . . .

Criden: I am going to have lunch with this guy, with Murphy. And I am gonna make sure he understands clearly. . . .

. . . .

Criden: I've got to coach these guys. I've got to make them feel at ease.

. . . .

Criden: I gotta stroke him, you know, uh, make him feel comfortable.

Weinberg: They all got that problem, they're nervous.

Criden: They're all nervous. You know, they all figure that maybe it's a set up, you know.

. . . .

Weinberg: Thompson must have spoken to him, huh.

Criden: Yeah, naturally.

The caution displayed by Thompson and Murphy permitted them a chance to confront the jury with a contestable question of fact. The jury, asked to determine the factual question of whether Thompson and Murphy knowingly took money while seeking to minimize the incriminating nature of their own words and conduct, saw through the ploy. Facing the legal issue of whether the investigators' bribe offer was unfairly obscured, we are equally unmoved. The agents did not violate due process limits by observing the defendants' ground rules.

Murphy further contends that there is a First Amendment dimension to the due process claim of deliberate creation of ambiguous facts. The ambiguities of what occurred on October 20, he suggests, blur the line that must be maintained between unlawful conduct that violates criminal statutes and lawful conduct, protected by the First Amendment, that occurs when a Congressman discusses legislative action and assistance with his constituents. Reliance is placed on cases such as *United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), and *United States v. Spock,* 416 F.2d 165 (1st Cir. 1969).

This First Amendment claim is untenable. Unlike *O'Brien,* there is no issue in these appeals whether conduct arguably protected by the First Amendment as expression is nonetheless being punished. "[I]t is *taking* the bribe [or an unlawful gratuity], not performance of the illicit compact, that is the criminal act." *United States v. Brewster, supra,* 408 U.S. at 526, 92 S.Ct. at 2544 (emphasis original). Nor do these appeals present the issue, illustrated by *Spock,* whether a lawful objective was pursued by lawful or unlawful means. *See United States v. Spock, supra,* 416 F.2d at 169. In some circumstances a prosecution of a Congressman for bribery can present a

close question as to whether money was received as an illegal bribe or a lawful campaign contribution; in such cases, the jury must be carefully instructed as to the distinction, and the evidence must show "specific knowledge of a definite official act" for which payment is made. *United States v. Brewster, supra,* 506 F.2d at 81. But none of these Congressmen claimed that he had received what he thought was a campaign contribution.[20] Murphy's point is that, at least in his case, there was an undue risk that the jury might convict him simply for engaging in the normal congressional activities of meeting with people who might invest in his district and advising people on immigration matters. That risk was adequately met by Judge Pratt's instructions, which focused the jury's attention squarely on whether Murphy knew that there was money inside the briefcase transferred on October 20 and whether Murphy received that money. The First Amendment claim cannot obscure the fact that Murphy accepted Thompson's invitation to accept money unlawfully under an arrangement that they both mistakenly believed would yield insufficient evidence of their guilt. The risk of a mistaken conviction is adequately protected by scrutinizing the sufficiency of the evidence on which a jury is permitted to find guilt beyond a reasonable doubt.

2. *Conduct of the Investigation.* Appellants' remaining challenges to the accuracy of the Government's proof require little discussion. They voice a chorus of indignation that the Government would employ the services of such an untrustworthy person as Weinberg, and they fault the FBI agents and prosecutors for not subjecting Weinberg to more exacting supervision and for compensating him too generously. They challenge Weinberg's failure to record all of his conversations with all of the defendants and his loss and erasure of some audio tapes. They urge that in various respects the entire investigation failed to conform to

---

**20.** Though Lederer was quoted by Cook as saying he would be satisfied with only a $5,000 campaign contribution from his lawyer friends out of the $50,000 payment, he made no claim at trial that he thought the sheik's representatives were making a donation to his campaign. His sole defense was entrapment.

internal guidelines of the Department of Justice promulgated by former Attorney General Edward Levi.

The use of dishonest and deceitful informants like Weinberg creates risks to which the attention of juries must be forcefully called, but the Due Process Clause does not forbid their employment, detail their supervision, nor specify their compensation. Weinberg's rewards, both in cash and in lenient treatment for his 1977 fraud conviction, were fully explored with the jury. Though the appellants claimed that he was induced to lie by offers of contingent payments for making cases, the District Court found no such arrangement. 527 F.Supp. at 1240. No doubt Weinberg did not record every conversation with every defendant, but hundreds of audiotapes were made, in addition to the videotaping of all the meetings with the Congressmen. Despite the appellants' dark insinuations, the evidence fully justified Judge Pratt's findings that on one occasion a few audiotapes were stolen from Weinberg's flight bag and on other occasions, Weinberg recorded over and thereby erased previously taped conversations that were unimportant. *Id.* at 1231. There was conflicting evidence, considered by the jury, as to whether on another occasion a tape gap was the result of accident, as Weinberg claimed, or deliberate manipulation, as a defense witness claimed. In no instance can defendants point to any unrecorded conversation or portion of a conversation that would have added anything of significance to their defenses. Non-compliance with internal departmental guidelines is not a ground for complaint. *United States v. Caceres,* 440 U.S. 741, 99 S.Ct. 1465, 59 L.Ed.2d 733 (1979).

3. Brady *Claims.* Appellants contend that various items were not disclosed to them until after the completion of the jury trials, items that they claim were exculpatory and required to be disclosed under the rule of *Brady v. Maryland, supra.* Many of the claims concern items that would allegedly have bolstered the attack upon the credibility of Weinberg. Judge Pratt prop-

erly placed these claims in perspective when he noted the abundant grounds available to the defendants at trial to impeach Weinberg's credibility:

> Weinberg admitted that he had been criminal most of his life, that he had made his living by being a con man, that he had lied and cheated and violated the law from his early teenage years, that he was a convicted felon, that he *had made a deal* with the government to cooperate in return for probation on his felony conviction in Pittsburgh, and that he had received substantial compensation for his cooperation in the Abscam investigation and trials.

527 F.Supp. at 1248.

In any event, the claims are without merit. Criden points to evidence he contends would have buttressed his claim that Weinberg had received and had falsely denied receiving a $350 microwave oven and other gifts from Errichetti. The prosecution had sought to support Weinberg's credibility with evidence that he had promptly turned over to FBI agents three $6,000 gold watches given him by George Katz, a defendant in another Abscam case. At the *Myers* trial, Weinberg testified that he told the agents about the watches after he received them. What Criden now complains of is the late disclosure of a memorandum indicating that Weinberg had told the agents about the watches even prior to his receipt of them. Whenever he mentioned them, the Government's point remains that Weinberg was not likely to conceal a $350 gift when he had been forthcoming about an $18,000 gift. Lederer complains that not until after his trial did he obtain the transcript of the August 9, 1979, "coaching" session involving Weinberg and Senator Williams and other documents revealing criticism by the New Jersey prosecutors of Weinberg's tactics. In fact, Lederer did receive, prior to trial, a lengthy memorandum in which a senior Department of Justice official summarized the criticism from the New Jersey prosecutors and much of the basis for their criticism. Armed with this memorandum, Lederer called two New

Jersey prosecutors as defense witnesses to testify about the August 9 session. Moreover, Lederer's defense was entrapment, not "playacting." Thompson claims he could have bolstered his attack on Weinberg's credibility if he had been given Weinberg's testimony at the "due process" hearing in Philadelphia before Judge Fullam, in which Weinberg falsely denied having been cautioned, after the August 9 session, not to coach potential defendants. The falsity of this denial was not relevant to any testimony Weinberg gave at Thompson's trial. Thompson made no claim that he had been "coached" into making false promises to help the sheik. Moreover, like all the defendants, he had abundant grounds on which to attack Weinberg's credibility. None of these claims, nor any of the other alleged *Brady* violations, which we do not detail, remotely provides a basis for any relief.

 \* \* \* \* \* \*

■ Having considered all of appellants' claims that the investigation violated the standards of the Due Process Clause, we conclude that the conduct of the Abscam operation did not deny any appellant a constitutionally protected right.[21] Appellants contend, nevertheless, that we should assess the conduct of the government agents under more exacting standards than those of the Due Process Clause and dismiss the indictments in the exercise of our supervisory power over the administration of criminal justice. Whatever the scope of that authority in the aftermath of *United States v. Payner,* 447 U.S. 727, 100 S.Ct. 2439, 65 L.Ed.2d 468 (1980), it does not permit courts to fashion their own "sub-constitutional" limitations on the conduct of law enforce-

ment agents. Prior to *Payner,* the supervisory power was used to fashion and enforce rules for judicial proceedings in order to safeguard important constitutional rights. *See, e.g., United States v. Mohabir,* 624 F.2d 1140, 1151–53 (2d Cir. 1980) (right to counsel); *United States v. Hinton,* 543 F.2d 1002, 1010 (2d Cir.) (self-incrimination), *cert. denied,* 429 U.S. 980, 97 S.Ct. 493, 50 L.Ed.2d 589 (1976). And, on infrequent occasions, the power was used to discipline prosecutorial irregularities, particularly in front of grand juries. *See United States v. Jacobs,* 531 F.2d 87 (2d Cir.), *vacated mem.,* 429 U.S. 909, 97 S.Ct. 299, 50 L.Ed.2d 277, *reinstated,* 547 F.2d 772 (2d Cir. 1977), *cert. dismissed,* 436 U.S. 31, 98 S.Ct. 1873, 56 L.Ed.2d 53 (1978). It has not been used as a general corrective authority over the conduct of criminal investigations, and, in light of *Payner,* its scope is surely not to be expanded. Appellants are entitled to no more from the courts than a testing of Abscam against constitutional standards.

## IV.

We consider next a series of claims that arise in one or another of the three trials.

### A. *Myers* Trial

■ 1. *Sufficiency of Evidence.* Criden and Johanson both challenge the sufficiency of the evidence to establish that they knew the purpose for which the money was paid to Myers. The record shows their awareness at the early stages of the plan; their law partner, Cook, testified that after the meeting on the yacht, Criden and Johanson told him about the sheik's concern for asylum in the United States and that

---

21. Some of the appellants contend that venue was improperly laid in the Eastern District of New York. They acknowledge that significant events occurred in that District, notably the payments to Myers, Lederer, and Murphy, the last of which was shared with Thompson. The claim is that venue was "manufactured" in the Eastern District for ulterior reasons, primarily to enable the Eastern District prosecutors to handle the trials. In *United States v. Archer,* 486 F.2d 670 (2nd Cir. 1973), we rejected the Government's attempt to create federal jurisdiction by luring a defendant into placing a telephone call across a state line. We do not preclude the possibility of similar concerns if a case should arise in which key events occur in one district, but the prosecution, preferring trial elsewhere, lures a defendant to a distant district for some minor event simply to establish venue. Here, the key events occurred in the Eastern District of New York, and the Government cannot be faulted for selecting hotels near Kennedy Airport as the site for transactions involving Congressmen from New York, New Jersey, and Pennsylvania.

payment to Congressmen would assure a "friendly face" who "owed him a favor" and would "help" him. Criden's claimed assurance that the Congressmen would never have to do anything does not lessen his and Johanson's knowledge that the money was being corruptly received for a promise to be influenced concerning official action, whether or not the promise was intended to be kept. Criden's attendance at and participation in the January conversations with Myers in Philadelphia leave no doubt whatever of his knowledge. Johanson's knowledge was fairly inferable by the jury from his initial hearing of the plan, his recruitment of Myers, his receipt of cash, and his acknowledgment to the FBI that he had had many sleepless nights but had not been able to resist the chance to make some easy money. This non-hearsay evidence of Johanson's culpability justified the admission against him of the acts and declarations of the co-conspirators. *See United States v. Mastropieri,* 685 F.2d 776, 785–790 (2d Cir. 1982).

■ *2. Evidentiary Ruling.* The *Myers* appellants contend that it was error to admit into evidence the January, 1980 conversations that Myers and Criden had with undercover agents Wald and Haridopoulos at the Barclay Hotel in Philadelphia. In these conversations Myers demanded an additional $35,000 to bring his share up to the $50,000 he had expected to receive from the August 22, 1979, meeting; he also discussed possible investments by the sheik that would provide a justification for his assistance with immigration matters. Appellants contend that these conversations were evidence of other crimes occurring after the end of the conspiracy concerning the August 22 payment and were inadmissible under Fed. R. Evid. 404(b). The argument builds upon the ruling Judge Pratt made when the evidence was offered. Anxious to keep the jury's attention focused on the August 22 episode, Judge Pratt told the jury that the January conversations were "outside the conspiracy charged in the indictment" and should be considered as acts and statements "only against the defendant who made them." In fact, the conversations, illuminating the nature of the conspiracy and occurring while the conspiracy was still in existence, were fully admissible against all defendants. Judge Pratt's limiting instruction, as he recognized, was unduly favorable to the defendants and affords them no basis to complain.

■ *3. Jury Instructions.* Criden levels several attacks upon the charge in the *Myers* trial, none of which has merit. It was not error for the District Court to decide the appellants' due process claims, without submitting them to the jury. *United States v. Nunez-Rios,* 622 F.2d 1093, 1098 (2d Cir. 1980). In a general observation in the portion of the charge concerning witness credibility, Judge Pratt told the jury that they may consider a witness's prior "failure to disclose information, when the opportunity to do so presented itself." Criden apprehends that the jury may have taken this as permission to draw an adverse inference from Myers' silence during the course of an interview with FBI agents. This portion of the charge was not directed at Myers, the jury was not told that Myers had exercised his right to remain silent during the interview, and in any event, Myers' failure to give his version of the facts was probative since he had elected to make statements to the agent before deciding to end the interview. *See Anderson v. Charles,* 447 U.S. 404, 100 S.Ct. 2180, 65 L.Ed.2d 222 (1980) (per curiam). It was not improper to refer to Weinberg as an "informer," and the charge adequately cautioned the jury concerning his testimony. Finally, it was surely not prejudicial error, if error at all, to omit the requested instruction that the jury may infer that tapes and unrecorded portions of tapes not produced by the Government would be unfavorable to the prosecution if the jury found that such tapes or portions "could" have contained pertinent material. The failure to record all conversations and all portions of taped conversations and the dispute concerning whether Weinberg had purposely erased two tapes of conversations with Errichetti were fully argued to the jury.

B. *Lederer* Trial.

 1. *Evidentiary Ruling.* Lederer contends that evidence was introduced at his trial in violation of the Speech or Debate Clause. He objects to the admission of his annual financial disclosure statement, filed with the Clerk of the House of Representatives pursuant to the Ethics in Government Act of 1978, 2 U.S.C. § 701 *et seq.* (Supp. IV 1980). In that statement Lederer falsely listed his $5,000 share of the bribe as a "consulting fee" from Johanson. The financial report was not shielded by the Speech or Debate Clause. Though the Clause, in covering "legislative acts," *Gravel v. United States,* 408 U.S. 606, 625, 92 S.Ct. 2614, 2627, 33 L.Ed.2d 583 (1972), extends beyond words spoken during legislative debate, any other matters it reaches "must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings . . . ." *Id.* Disclosure of income from sources other than employment by the United States, *see* 2 U.S.C. § 702(a)(1)(A), is no part of such "deliberative and communicative processes." *Cf. Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) (newsletters and press releases); *United States ex rel. Hollander v. Clay,* 420 F.Supp. 853 (D.D.C. 1976) (Congressional travel vouchers). Prosecutions for falsification of similar statements indicate that Lederer's financial disclosure statement was not shielded. *See United States v. Bramblett,* 348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955) (prosecution for false statement to House Disbursing Office); *United States v. Diggs,* 613 F.2d 988 (D.C. Cir. 1979) (prosecution for false statement to House Office of Finance), *cert. denied,* 446 U.S. 982, 100 S.Ct. 2961, 64 L.Ed.2d 838 (1980).

██ 2. *Jury Instructions.* Lederer's two objections to the charge are without merit. It was not error for Judge Pratt to explain "predisposition" by asking the jury to determine whether the defendant was "ready and willing" to commit the crimes charged whenever a favorable opportunity arose. *United States v. Sherman,* 200 F.2d 880, 882 (2d Cir. 1952). Lederer would have preferred an explanation that required finding a "previous intent or purpose," as some courts have phrased the test, *e.g., United States v. Karas,* 624 F.2d 500, 503 n. 2 (4th Cir. 1980), *cert. denied,* 449 U.S. 1078, 101 S.Ct. 857, 66 L.Ed.2d 800 (1981). In this Circuit, the "ready and willing" phrase has been repeatedly used. *E.g., United States v. Martinez-Carcano,* 557 F.2d 966, 969–70 (2d Cir. 1977); *United States v. Rosner,* 485 F.2d 1213, 1222 nn. 11 & 12 (2d Cir. 1973), *cert. denied,* 417 U.S. 950, 94 S.Ct. 3080, 41 L.Ed.2d 672 (1974); *United States v. Braver,* 450 F.2d 799, 801 n. 4, 805 (2d Cir. 1971), *cert. denied,* 405 U.S. 1064, 92 S.Ct. 1493, 31 L.Ed.2d 794 (1972). The jury need not find that the defendant consciously considered committing the crime before the opportunity arose, only that he was predisposed to accept the opportunity presented to him, *i.e.,* of a frame of mind that made him "ready and willing" to commit a crime, even on the first occasion that he may have considered it.

██ Nor was it improper to tell the jury, in the course of explaining that the defendant has no obligation to present any evidence, that a defendant has the power to subpoena witnesses. This phrase prompted no objection at trial, and cannot be raised on appeal. In any event, there is no merit to Lederer's suggestion that the jury might have mistakenly thought he could have called Errichetti, Criden, and Johanson to support his entrapment claim. Having failed to subpoena his severed co-defendants, Lederer cannot assume that their testimony was not available to him. *Cf. United States v. Wright,* 588 F.2d 31, 36 (2d Cir. 1978) (failure to subpoena witness precludes claim that lack of use immunity for the witness created prejudice), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1236, 59 L.Ed.2d 467 (1979).

C. *Thompson-Murphy* Trial

1. *The "Impossibility" Defense.* Thompson contends that the indictment against him fails to state an offense on the theory that the fictional nature of the

"sheiks" and their immigration problems renders the crime of bribery, as alleged in the indictment, impossible of performance. The "impossibility" defense has been a matter of conflicting views. *Compare People v. Jaffe,* 185 N.Y. 497, 78 N.E. 169 (1906) (defense upheld as to a "fence" who bought goods from a police informant that were not in fact stolen), *and State v. Guffey,* 262 S.W.2d 152 (Mo.App. 1953) (defense upheld as to a hunter who shot a stuffed deer placed as a decoy by a game warden), *with People v. Rojas,* 55 Cal.2d 252, 10 Cal.Rptr. 465, 358 P.2d 921 (1961) (rejecting defense as to a "fence" who bought goods not in fact stolen). Federal courts have upheld the defense when the crime charged had not in fact occurred, even though the defendant thought it had. *E.g., United States v. Oviedo,* 525 F.2d 881 (5th Cir. 1976) (sale of uncontrolled substance incorrectly believed to be controlled substance); *United States v. Berrigan,* 482 F.2d 171 (3d Cir. 1973) (transmittal of letters to prison inmate incorrectly believed to be without warden's knowledge).

The claim is unavailing here for the basic reason that the crime charged did occur. The indictment charged and the evidence established that Thompson received a bribe in return for his corrupt promise to take official action. That suffices to constitute a violation of § 201(c). *United States v. Brewster, supra,* 408 U.S. at 525–26, 92 S.Ct. at 2544. Whether the promise was carried out is irrelevant, *id.* at 527, 92 S.Ct. at 2544, and it is no defense that the promise could not have been carried out either

because the official act to be taken was beyond the defendant's authority, *United States v. Carson,* 464 F.2d 424, 433 (2d Cir.), *cert. denied,* 409 U.S. 949, 93 S.Ct. 268, 34 L.Ed.2d 219 (1972); *United States v. Heffler,* 402 F.2d 924 (3d Cir. 1968), *cert. denied,* 394 U.S. 946, 89 S.Ct. 1280, 22 L.Ed.2d 480 (1969), or had already been taken, *United States v. Arroyo, supra,* 581 F.2d at 653–57; *cf. United States v. Rosner, supra,* (18 U.S.C. § 201(b), punishing the bribe-payer, is violated whether or not purpose of the bribe is capable of attainment); *United States v. Jacobs,* 431 F.2d at 759 (same).[22] Neither is it a defense that the public official will not be called upon to take official action because of the fictitious nature of the person alleged to be seeking assistance. "Official act" is defined as action on any matter that "may at any time be pending" before a public official, 18 U.S.C. § 201(a). Introducing a private immigration bill qualifies as an "official act," whether or not the beneficiary of such a bill is a real person. It was not necessary for the investigators to continue Abscam to the point of having bills introduced, conduct that would, in any event, have been immunized by the Speech or Debate Clause. *See United States v. Johnson,* 383 U.S. 169, 180, 86 S.Ct. 749, 755, 15 L.Ed.2d 681 (1966).

*2(a). Jury Instructions—Element of Receipt.* Thompson and Murphy both challenge portions of the jury instructions. One claim, applicable to all of the substantive counts, attacks Judge Pratt's supplemental instruction, in response to a jury inquiry, concerning the element of receipt of illegal

---

**22.** Thompson relies on *United States v. Reisley,* 35 F.Supp. 102 (D.N.J. 1940), in which Circuit Judge Maris, sitting in the District Court, upheld a defense to an indictment charging violation of 18 U.S.C. § 203 (1934), a conflict of interest statute that preceded 18 U.S.C. § 281 (1958) and 18 U.S.C. § 203 (1976). An employee of the Veterans Administration had received money for promising to effect an increase in the payor's benefits. In fact, the increase had already occurred without any action by the defendant. *Reisley* viewed the offense as accepting payment for services rendered, and acquitted the defendant since in fact services had not been rendered. Even if that decision is correct as to a conflict of interest violation, its

force as applied to a bribery violation is negated by the explicit Congressional recognition, expressed by the House Committee on the Judiciary when the current bribery statutes were revised in 1962, that "it is the purpose for which the recipient knows the bribe *is* offered or given when he solicits, receives, or agrees to receive it which is determinative of criminality." H. Rep. No. 748, 87th Cong., 1st Sess. 18 (1961). The House Report cited approvingly to *Whitney v. United States,* 99 F.2d 327, 331 (10th Cir. 1938), which had construed an early bribery statute, 18 U.S.C. § 207 (1934), contrary to *Reisley's* view of a conflict of interest statute.

payment. Understanding the claim requires some elaboration of the pertinent circumstances. The counts of the indictment charging violations of bribery, unlawful gratuity, and conflict of interest all alleged receipt of money between October 10, 1979, and February 2, 1980. The Government's theory of the *Thompson-Murphy* case was that the substantive offenses committed by both Thompson and Murphy arose out of the October 20 transaction involving Murphy and Criden, not the October 9 transaction involving Thompson and Criden. In its bill of particulars the Government alleged that the $50,000 cash payment "was received by Criden and Murphy on October 20, 1979 .... Criden left the meeting in physical possession of the money. The date on which and the place where Murphy took physical possession of his share of the payment is [*sic*] unknown." In charging the jury initially with respect to the "receipt" element of Count Two, the bribery offense, Judge Pratt focused the jury's attention on the issue of whether either defendant had received a share of the $50,000 *after* the October 20 meeting: "It is for you to determine based on all of the evidence whether the Government has established beyond a reasonable doubt that the money in the briefcase transferred from Amoroso to Criden on October 20th was for the benefit of and *eventually received* by defendant Murphy or defendant Thompson or both." (Emphasis added.) The jury was told that this "receipt" element also applied to the unlawful gratuity and conflict of interest counts, and that a defendant who did not receive part of the money must be acquitted on all the substantive counts.

The jury's first inquiry on this issue read as follows:

Your Honor, If this question is in order—

If the briefcase was under the control of but not in the physical possession of the defendant Murphy, does [*sic*] that, under your charge, be considered "for the benefit of an eventual reception by defendant Murphy or defendant Thompson or both?["]

Judge Pratt apparently thought that the jury mistakenly understood that Murphy's possession of the briefcase at the October 20 meeting was a required aspect of a finding of receipt by him. He therefore gave a supplemental instruction that included the following:

In specific answer to your question, as I interpret it, actual possession of the briefcase itself by Murphy would not have to be shown before you could determine that he later received part of the money.

The correctness of this response is not challenged on appeal. It soon became apparent that the jury had not wondered whether Murphy's actual possession on October 20 was required; they were making the more trenchant inquiry as to whether his constructive possession on that date was sufficient. Their subsequent note read as follows:

Your honor:

Some members of the jury feel it is possible that defendant Murphy took "direction & control" of the briefcase however momentarily by instructing Criden to take physical possession, making Criden the "executor" of the money in a sense at that point.

May we construe this to be in satisfaction of element one of Count 2 in lieu of "*eventually*["] receiving the money at some later time? [Emphasis original.]

This inquiry provoked an extended colloquy between Court and counsel. Murphy contended that the inquiry should be answered with a simple "no," arguing that any other response would unfairly alter the Government's theory of how the offense occurred. This concern was heightened when the prosecutor, in urging that the proper response was "yes," pointed out that the bribery statute is violated when a public official receives anything of value either "for himself or for any other person or entity." Ultimately, Judge Pratt decided to steer a middle course, rejecting a "no" answer and also rejecting the Government's effort to permit the jury to convict Murphy on the theory that he was merely seeking to confer a benefit upon Criden. Instead,

Judge Pratt kept the jury's attention focused on the crucial element of whether money was received by Murphy and for his benefit, but permitted the jury to consider whether receipt by Murphy was established by his words and conduct at the October 20 meeting. First, he reminded the jury to focus on the essential element of Count Two, which he summarized as being "that on or shortly after October 20, 1979, the defendant received a sum of money." He then endeavored to paraphrase the jury's inquiry and respond to it:

When I said in the charge it is for you to determine based upon all the evidence whether the Government has established beyond a reasonable doubt that the money in the briefcase transferred from Amoroso to Criden on October 20th, was *for the benefit and eventually received* by the defendant Murphy, or defendant Thompson, or both, when I use the term "eventually," there did I really mean eventually and not then, October 20th[?]

And my answer to that is[:] you in applying this element to the defendant Murphy, you may disregard the term eventually. *It is for you to evaluate what was said, what happened, what the circumstances were, and determine from that whether the defendant Murphy received the money.* [Emphasis added.]

Since the major factual dispute framed by Murphy's cross-examination and summation was whether Murphy had any knowledge that money was in the briefcase, Judge Pratt emphasized that the element of receipt could not be established unless the jury found that Murphy knew that money was in the briefcase. He then recapitulated his response in these words:

So my final answer to your question is: If you are talking simply about the temporal aspect of this, the timing now as opposed to eventually, the answer is yes. You may construe those circumstances to be receipt of money on or shortly after October 20, 1979, as that set forth in the element one of Count 2.

Significantly, the only criticism voiced by counsel after hearing the supplemental instruction was to request that one sentence of the response might have been misunderstood as altering the Government's burden of proof as to knowledge. Judge Pratt promptly recalled the jury and reemphasized, as he had when the inquiry was first answered, that the burden to prove Murphy's knowledge of the money beyond a reasonable doubt rested upon the Government.

■ The supplemental instruction presents no ground on which either Murphy or Thompson may now complain.[23] Judge Pratt's response did not alter the requirement that the money be received for the benefit of the defendant.[24] Limiting him-

23. Complaint is also made that Judge Pratt did not adequately alert counsel to his proposed response before giving it to the jury. *See United States v. Ronder,* 639 F.2d 931 (2d Cir. 1981). Although Judge Pratt did not give counsel a verbatim version of his proposed response, he held an extended colloquy with counsel, afforded both sides an opportunity to suggest their preferred responses, then outlined, in summary fashion, the response he proposed to give, and thereafter allowed counsel to make further argument. There is no basis for procedural complaint, especially in view of the fact that counsel's remarks, after hearing what Judge Pratt proposed to do, questioned only the substance of the response and offered no suggestion that might improve its wording.

24. *Murphy was acquitted on the bribery count* and therefore challenges the supplemental instruction only as it may have affected the element of receipt for the unlawful gratuity and conflict of interest counts, the substantive counts on which he was convicted. Since we conclude that the supplemental instruction did not alter the prosecution's obligation to prove that Murphy must be shown to have received the money for his benefit, we are willing to assume, for the sake of argument, that, though the jury's inquiry mentioned only Count Two, they understood the response also to apply to the receipt element of the counts charging an unlawful gratuity and a conflict of interest. In his initial charge, Judge Pratt had told the jury that the element of receipt as to bribery applied equally to the other substantive offenses. Section 201(g), punishing receipt of an unlawful gratuity, is limited to receipt by the public official "for himself," and "for any other person or entity" as provided in section 201(c), punishing bribery. We are also willing to assume, for the sake of argument, that section 203(a), punishing conflict of interest, is limited to receipt

self to the precise point raised by the jury, he broadened only the temporal aspect of receipt. He permitted a finding of receipt not only at some point after October 20 but also at the time of the October 20 meeting. This permitted the jury to find that Murphy had constructively received the money for himself on October 20 and had permitted Criden to take physical possession, presumably with the expectation that at some point Murphy would regain physical possession of a portion of the money, even if the occurrence of that last step was not found to have been established.[25] The jury wanted to know if receipt could be found to have occurred on October 20, and Judge Pratt correctly told them that it could. Since the principally disputed issue as to Murphy was whether he knew there was any money in the briefcase on October 20, it is difficult to see how the defense would have acted differently if it had been specifically alerted to a theory of receipt on October 20, a theory that, in any event, was comprehended by the bill of particulars. In arguing the point on appeal, Murphy makes no showing of any prejudice from the supplemental instruction. Thompson likewise offers no theory of prejudice as to him. The jury's question and the Court's response both related explicitly to Murphy, leaving unvaried in any respect the initial instruction that the jury must find Thompson to have received his share of the October 20 payment sometime after the meeting.

■ Murphy contends that the instruction permitted the jury to find receipt on a theory of constructive possession without

of compensation by and for the public official, though this point is somewhat doubtful. *Cf. United States v. Shirey,* 359 U.S. 255, 79 S.Ct. 746, 3 L.Ed.2d 789 (1959) (construing 18 U.S.C. § 214 (1958) (now 18 U.S.C. § 210 (1976)).

**25.** Early in the colloquy with counsel, Judge Pratt had suggested that it would be "kind of a far-out view" if the jury thought that on October 20, Murphy "really didn't accept [the money] for his own benefit" and was "giving it up to Howard Criden with no further claims on it." On appeal counsel dwell on this characterization, overlooking the fact that the supplemental instruction that Judge Pratt decided to give did not permit the jury to abandon the requirement

adequate guidance as to the standards governing that concept. That complaint cannot be made now. Counsel had ample opportunity after hearing both the substance of Judge Pratt's proposed response and the delivery of the response to suggest additional language explicating constructive possession. If the jury's approximation of the concept evident from the text of their inquiry required refinement, the opportunity for amplification was available to the defendants both before and after the instruction was given. This is not the first time that a jury's question has insightfully gone to the heart of a matter. Judge Pratt's handling of the episode was admirable under the circumstances.

*2(b). Jury Instructions—the Section 203(a) Offense.* Murphy challenges the jury instruction concerning the elements of Count Three, the so-called conflict of interest offense, 18 U.S.C. § 203(a). His principal point is that section 203(a) proscribes receipt of payment for rendering only "representational" services before government agencies, whereas the District Court's instruction permitted the jury to find a violation for rendering services of a broader nature including merely giving advice.[26] The claim requires consideration of the structure of the text of section 203(a), which reads as follows:

> Whoever, otherwise than as provided by law for the proper discharge of official duties, directly or indirectly receives or agrees to receive, or asks, demands, solicits, or seeks, any compensation for any services rendered or to be rendered either by himself or another—

that Murphy must receive the money for his own benefit.

**26.** Murphy also contends that the charge was deficient in not specifying as an element of the offense that the proceeding in relation to which services are rendered be *pending* before a governmental forum. However, the statute contains no requirement of a proceeding pending at the time compensation is received. *United States v. Evans,* 572 F.2d 455, 481 (5th Cir.), *cert. denied,* 439 U.S. 870, 99 S.Ct. 200, 58 L.Ed.2d 182 (1978); *United States v. Johnson,* 337 F.2d 180, 196 (4th Cir. 1964), *aff'd,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966).

(1) at a time when he is a Member of Congress, Member of Congress Elect, Delegate from the District of Columbia, Delegate Elect from the District of Columbia, Resident Commissioner, or Resident Commissioner Elect; or

(2) at a time when he is an officer or employee of the United States in the executive, legislative, or judicial branch of the Government, or in any agency of the United States, including the District of Columbia,

in relation to any proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which the United States is a party or has a direct and substantial interest, before any department, agency, court-martial, officer, or any civil, military, or naval commission, [shall be punished].

From the standpoint of grammar, the issue is whether the phrase "before any department, agency, court-martial, officer, or any civil, military, or naval commission" modifies the category of covered proceedings or the category of covered services. The placement of the "before" phrase adjacent to the category of covered proceedings is some indication that only the immediately preceding category was intended to be modified. But this structural point is not so compelling as to preclude examination of legislative history. The Report of the Senate Committee on the Judiciary describes the predecessor statute, 18 U.S.C. § 281 (1958), as prohibiting Members of Congress and officers and employees of the Government "from receiving compensation for services rendered for others before a Federal department or agency in matters in which the Government is a party or is interested." S. Rep. 2213, 87 Cong., 2d Sess. 9, *reprinted in* 1962 U.S. Code Cong. & Ad. News 3852, 3858. In section 281 the "before" phrase had appeared in the same position as it does in section 203(a), yet the drafters of the Senate Report apparently thought the phrase modified the services rendered. The Report points out that section 203(a) continues the restraint of the prior section "in full effect" with one exception not here pertinent. *Id.* The Report of the House Committee on the Judiciary contains two references to our problem; unhappily each points in a different direction. The summary of provisions, like the Senate Report, describes the predecessor statute, section 281, as *prohibiting receipt* of compensation "for services rendered before Federal agencies" in matters in which the United States has an interest. H. Rep. No. 748, 87th Cong., 1st Sess. 9 (1961). However, the section-by-section analysis describes former section 281 as prohibiting receipt of compensation "for services in relation to any matter in which the United States is interested and which is before any Government agency." *Id.* at 19. Our uncertainty remains.

Fortunately, section 203(a)'s statutory genealogy provides significant clues to its meaning. In 1864, Civil War scandals involving corrupt use of influence prompted Congress to pass section 203(a)'s earliest predecessor, a statute barring Members of Congress and federal employees from receiving compensation for rendering services in governmental proceedings before federal departments, agencies, and military commissions. Act of June 11, 1864, ch. 119, 13 Stat. 123.[27] Although the language of this

---

27. *See* Ass'n of the Bar of the City of New York, *Conflict of Interest and Federal Service* 40 (1960).

The original statute read as follows:

[N]o member of the Senate or House of Representatives shall, after his election and during his continuance in office, nor shall any head of a department, head of a bureau, clerk, or any other officer of the government receive or agree to receive any compensation whatsoever, directly or indirectly, for any services rendered, or to be rendered, after the passage of this act, to any person, either by himself or another, in relation to any proceeding, contract, claim, controversy, charge, accusation, arrest, or other matter or thing in which the United States is a party, or directly or indirectly interested, before any department, court-martial, bureau, officer, or any civil, military, or naval commission whatever.

The statute was recodified in essentially the same form in R.S. § 1782 (1873). Later, it was

early statute shares the grammatical ambiguity of current section 203(a), the legislative debate that surrounded its passage reveals that Congress was primarily concerned with government officials' being paid to bring their influence to bear on federal agencies. According to Senator Trumbull, Chairman of the Senate Judiciary Committee, the statute was designed "to prevent Representatives and Senators in Congress and officers of the government who are paid for their services from receiving a compensation for advocating claims in the Departments and before the bureaus of Government." Cong. Globe, 38th Cong., 1st Sess. 561 (1864).

In interpreting the more recent predecessors of section 203(a), modern courts and commentators have agreed that an essential element of the offense is some appearance before, or at least contact with, a federal department by the accused official. In *United States v. Adams,* 115 F.Supp. 731, 735 (D.N.D. 1953), *appeal dismissed,* 209 F.2d 954 (8th Cir. 1954), a District Court dismissed an indictment based on 18 U.S.C. § 281 (1952), section 203(a)'s most recent predecessor, because the indictment failed to allege that the defendant's services were to be rendered before a federal department. *Accord United States v. Waldin,* 122 F.Supp. 903, 904 (E.D. Pa. 1954).[28] A review of the legislative history and cases has led a knowledgeable commentator in this area to conclude that under section 203(a),

and all its predecessors, "criminal penalty attaches to a government employee's compensated services if, and only if, the services are performed in particular designated forums." B. Manning, *Federal Conflict of Interest Law* 55 (1964). This background suggests that section 203(a) should be limited to services rendered before federal agencies—the mischief toward which the statute was directed—and not mere advice concerning agency proceedings.

A further consideration favoring this construction is the hazards created by a broader interpretation. Since a Member of Congress is entitled to appear before courts, even on matters in which the United States has an interest, *see, e.g., United States v. Waldin, supra; United States v. Quinn,* 111 F.Supp. 870 (E.D.N.Y. 1953), he may encounter a situation where a matter concerning his client merits court challenge but requires prior exhaustion of administrative remedies. Unquestionably the Member would be barred by section 203(a) from handling the matter before the administrative agency, and some courts apparently believe that section 203(a) prevents a government official from plea-bargaining with the Justice Department when the official is representing a criminal defendant. *See Chudoff v. McGranery,* 179 F.2d 869 (3d Cir. 1950). *But see United States v. Johnson,* 215 F.Supp. 300, 315 (D. Md. 1963), *aff'd on other grounds,* 337 F.2d 180 (4th

modestly revised and amended by Act of Mar. 4, 1909, ch. 321, § 113, 35 Stat. 1088, 1109. Afterwards, it was recodified at 18 U.S.C. § 203 (1926) where it remained until the 1948 revision of the federal criminal laws placed it, along with some minor amendments, at 18 U.S.C. § 281 (1952).

28. In most of the cases interpreting section 203(a), the defendants had actually rendered services before a federal agency. *See, e.g., Burton v. United States,* 202 U.S. 344, 26 S.Ct. 688, 50 L.Ed. 1057 (1906); *May v. United States,* 175 F.2d 994 (D.C. Cir.), *cert. denied,* 338 U.S. 830, 70 S.Ct. 58, 94 L.Ed. 505 (1949); *United States v. Johnson,* 419 F.2d 56 (4th Cir. 1969), *cert. denied,* 397 U.S. 1010, 90 S.Ct. 1235, 25 L.Ed.2d 423 (1970). It is of interest, though not decisive, that some of these decisions describe the statute as prohibiting the rendering of services before a federal department. In *Burton,* the Supreme Court, uphold-

ing the constitutionality of R.S. § 1782 (1873), a predecessor of section 203(a), referred to the authority of Congress to make it an offense for a Senator to receive compensation "for services to be rendered or rendered to any person, before a department of the government, in relation to a proceeding" in which the United States has an interest. 202 U.S. at 365; *see also United States v. Johnson,* 215 F.Supp. 300, 316 (D. Md. 1963) ("The words 'before any department, agency,' etc. refer to where the services have been rendered or are to be rendered, not where the proceeding or other matter is pending."), *aff'd on other grounds,* 337 F.2d 180, 196 (4th Cir. 1964), *aff'd,* 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966); *United States v. Booth,* 148 F. 112, 119 (C.C.D. Or. 1906) ("the service must be performed, 'before any department [etc.]' ").

Cir. 1964), aff'd, 383 U.S. 169, 86 S.Ct. 749, 15 L.Ed.2d 681 (1966). But, under the Government's view in the instant appeal, a federal official would also violate section 203(a) if the official, in the course of counseling his client, advised him to obtain additional counsel for representation before a federal department or agency. It seems unlikely that Congress, having framed section 203(a) to allow Members of Congress to represent clients in court, intended the statute to reach so far as to raise the prospect of a criminal violation when the lawyer-legislator counsels his client.

The Government suggests that a broad reading of section 203(a) is supported by a comparison of its terms with those of 18 U.S.C. § 205, set out in the margin,[29] which explicitly covers representational activities. Section 205 applies only to officers or employees of the United States and not to Members of Congress. It covers the identical category of proceedings described in section 203(a). Its list of forums is similar to that in section 203(a) with the notable addition of "courts."[30] But section 205 differs markedly from section 203(a) in two respects. First, section 205 prohibits conduct whether or not performed for compensation, whereas section 203(a) prohibits only conduct rendered for compensation. Second, and central to the Government's argument, section 205 prohibits an official from acting "as agent or attorney for anyone," whereas section 203(a) prohibits rendering "any services." From this latter difference the Government argues that Congress intended section 203(a) to proscribe a wider range of services than the representational services proscribed by section 205. The argument has some force, but is not decisive. Even as to officers or employees of the United States, who are covered by

**29.** Whoever, being an officer or employee of the United States in the executive, legislative, or judicial branch of the Government or in any agency of the United States, including the District of Columbia, otherwise than in the proper discharge of his duties—

(1) acts as agent or attorney for prosecuting any claim against the United States, or receives any gratuity, or any share of or interest in any such claim in consideration of assistance in the prosecution of such claim, or

(2) acts as agent or attorney for anyone before any department, agency, court-martial, officer, or any civil, military, or naval commission in connection with any proceeding, application, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, or other particular matter in which the United States is a party or has a direct and substantial interest—

Shall be fined not more than $10,000 or imprisoned for not more than two years, or both.

18 U.S.C. § 205 (1976). Section 205(1)'s earliest statutory forebear was enacted in 1853. It read:

[A]ny officer of the United States, or person holding any place of trust or profit, or discharging any official function under, or in connection with, any executive department of the Government of the United States, or under the Senate or House of Representatives of the United States, who, after the passage of this act, shall act as an agent or attorney for prosecuting any claim against the United States, or shall in any manner, or by any means, otherwise than in the discharge of his proper official duties, aid or assist in the prosecution or support of any such claim or claims, or shall receive any gratuity, or any share of or interest in any claim from any claimant against the United States, with intent to aid or assist, or in consideration of having aided or assisted, in the prosecution of such claim, shall be liable to indictment, as for a misdemeanor, in any court of the United States having jurisdiction thereof, and, on conviction, shall pay a fine not exceeding five thousand dollars, or suffer imprisonment in the penitentiary not exceeding one year, or both, as the court in its discretion shall adjudge.

Act of Feb. 26, 1853, ch. 81, § 2, 10 Stat. 170. This statute was recodified in essentially the same form in R.S. § 5498 (1873). Later, it was amended by Act of Mar. 1, 1901, ch. 670, § 1, 31 Stat. 844, and Act of Mar. 4, 1909, ch. 321, § 108, 35 Stat. 1088, 1107–08. Afterwards, it was recodified at 18 U.S.C. § 198 (1926), recodified again at 18 U.S.C. §§ 198, 198a (1934), and amended once more by the 1948 revision of the federal criminal laws. Finally, it was codified at 18 U.S.C. § 283 (1952).

This statute was most recently revised in 1962. Act of Oct. 23, 1962, Pub. L. 87–849, § 1(a), 76 Stat. 1122. The verbosity of previous versions was eliminated, and section 205(2) was added.

**30.** The combined effect of omitting Members of Congress from section 205 and omitting courts from the forums listed in section 203(a), which applies to Members of Congress, permits Members of Congress to appear before courts.

both statutes, the conduct proscribed by section 203(a) could be limited to services rendered before federal agencies, without completely duplicating the prohibition of section 205. Section 203(a) would then cover any contact made with an agency, whether or not the official was acting as agent or attorney, as specified in section 205.

The legislative history of section 205 undermines the Government's claim of a clear-cut distinction between sections 205 and 203(a). A House Report accompanying the 1962 revision of the federal conflict of interest laws states that the purpose of section 205 is to prevent federal employees "from using actual or supposed influence in support of private causes." H.R. Rep. No. 748, 87th Cong., 1st Sess. 21 (1961). The Report recognized that "section 281 [now section 203(a) ] prohibits conduct *of this nature* when compensated," but added that "it is important that this type of representative activity be prohibited when it is not compensated." *Id.* (emphasis added). This suggests, contrary to the Government's contention, that the conduct prohibited by sections 203(a) and 205, both of which apply to federal employees, is similar. Both involve using actual or supposed influence, with section 205, but not section 203(a), requiring a formal representational role. As pointed out in a Justice Department memorandum

of which Congress has taken note, "[W]hile section 203 is controlling as to Members of Congress, for all practical purposes section 205 completely overshadows section 203 in respect of officers and employees of the Government."[31] Memorandum of Attorney General—Standards of Ethical Conduct for Government Officers and Employees, Exec. Order No. 11,222 (1965), *reprinted in* 18 U.S.C. § 201 note, at 1025–32 (1976). If section 205 in fact largely duplicates section 203(a), as applied to federal employees, the Government cannot now argue that the two sections have two entirely distinct purposes.

The Government finally contends that section 203(a) should be broadly read to make sure that Members of Congress do not receive any extra compensation for rendering advice on governmental matters, advice that falls within their obligations to their constituents and the public generally. If Congress were to legislate that broadly, it would have to clarify the line between permissible legal practice and illegal advice on governmental matters.[32] Under all the circumstances, though we cannot be certain what Congress had in mind in the original enactment in 1864 or the revision in 1962, we think it sounder to construe section 203(a) to reach only services performed or to be performed before the federal forums listed in the statute.

---

**31.** Significantly, this memorandum describes section 203(a) as prohibiting Members of Congress and government employees from receiving compensation "for services rendered on behalf of another person before a Government department." 18 U.S.C. § 201 note, at 1028.

The parties call our attention to other views previously expressed by the Department of Justice, of which Congress has taken note. Murphy cites a Senate Judiciary Report that includes the following: "The Department of Justice has, however, followed the more restrictive interpretation that the services rendered for compensation by the public servant must be representational in nature and not merely in the form of advice or assistance in writing contracts and the like." *Criminal Code Reform Act of 1977: Report of the Senate Judiciary Comm.,* S. Rep. No. 95–605, 95th Cong., 1st Sess. pt. 1, at 403 (1977). The Government cites the following statement, submitted by the Department of Justice to a House Judiciary Subcommittee: "[A]ny utilization of official po-

sition to serve a private client, whether to influence the action of others or not, seems within the ban of the statute." Memorandum of the Office of Legal Counsel for the Attorney General (Dec. 10, 1956), *reprinted in Federal Conflict of Interest Legislation: Hearings Before the Antitrust Subcomm. of the House Comm. on the Judiciary,* 86th Cong., 2d Sess., ser. 17, pt. 2, at 645–46 (1960).

**32.** To a considerable extent, the Government's concern that Members of Congress should not be permitted to accept extra compensation for performing their duties is met by the provisions of the unlawful gratuity statute, 18 U.S.C. § 201(g) (1976), which formed the basis for Murphy's conviction on Count Five. Though that statute is broad in scope, it is limited to receipt of payment because of "any official act" performed or to be performed, and does not extend to the giving of advice, which the Government would include under § 203(a).

This interpretation, however, is not quite as limited as the "representational" role urged by Murphy. It includes, in the words of the statute, "any services . . . in relation to" the proceedings listed in the statute so long as the services are compensated and are rendered "before" the listed forums, whether or not the Member of Congress formally appears as attorney or agent. And, of course, informal contacts, as well as formal appearances, are proscribed.

In the *Thompson-Murphy* trial, Judge Pratt, over the objection of Murphy,[33] gave the jury a broad definition of the "services" element of a violation of section 203(a). Rather than limit the term "services" to those to be performed "before" a federal agency, as we construe the statute to require, he told the jury that the term could include "a wide variety of services such as giving advice about [i]mmigration, how to delay deportation, how to improve one's chances of remaining in the country . . . ." The summation on behalf of Murphy had argued, based on some of the phrases he used at the October 20 meeting, that he was only advising the sheik's representatives to consult with Criden, who would handle legal matters concerning immigration problems. Since the charge erroneously permitted the jury to convict on Count Three by considering this type of advice to be covered by section 203(a), the conviction on that count must be reversed. However, since the evidence was sufficient to permit a finding that Murphy had in fact accepted money for services to be rendered before federal agencies or departments on immigration matters, the Government is entitled to prosecute the section 203(a) charge anew, if it is so advised.

3. *Sufficiency of Evidence.* Thompson challenges the sufficiency of the evidence against him, contending that the evidence failed to show that he received a portion of the $50,000 transferred at the October 20 meeting with Murphy and Criden and failed to show that he agreed to take any official action. However, Cook testified that Criden told him about delivering Thompson's share to the Congressman at a coffee shop shortly after October 20. Thompson's meeting with Criden at the time and place Criden had mentioned to Cook was corroborated by eyewitness testimony. The jury was entitled to infer from the October 9 transaction with Thompson and Criden that Criden's report to Cook was credible. Thompson's agreement to take official action on immigration matters is fully established by his statements made at the morning meeting on October 9, the meaning of which is amplified by his statement to Congressman Murtha that "all we have to do is help these two Arabs get into the country perhaps sometime in the future."

Murphy's challenge to the sufficiency of the evidence claims that the prosecution did not prove his receipt of money for his benefit. The Government maintains that the evidence showed receipt by Murphy both at the October 20 meeting when the briefcase containing $50,000 was handed to Criden and at some point thereafter when Murphy obtained physical possession

---

**33.** The Government contends that Murphy waived objection to the charge by not objecting after its delivery to the jury, as required by Fed. R. Crim. P. 30. However, Murphy submitted a proposed instruction on section 203(a), which limited the prohibited services to "interceding" with federal agencies and made clear that advising a person to seek the advice of attorneys is not improper. "Interceding" may connote in some minds a more direct action than the rendering of "any" services "before" a federal forum "in relation to" a proceeding in which the United States has an interest. Nevertheless, the proposed instruction, if not precisely correct, sufficiently alerted the District Court to Murphy's well-taken point that giving advice is outside the reach of the statute. Normally, the submission of a requested instruction is not sufficient to preserve for appeal complaint that the charge as given failed to include it, *see United States v. Fountain,* 642 F.2d 1083, 1095 (7th Cir.), *cert. denied,* 451 U.S. 993, 101 S.Ct. 2335, 68 L.Ed.2d 854 (1981), but in this case, Judge Pratt informed counsel after considering and ruling upon requested instructions at a charge conference, that their objections voiced at that time would suffice to preserve issues for appeal, in lieu of renewing claims for such instructions after the jury charge. In that circumstance, the pre-charge objection to the denial of the requested instruction satisfied Rule 30.

of his share of the $50,000. We confine our attention to the October 20 meeting, which is apparently what the jury did, judging from their inquiry concerning constructive possession. In the context of the events that preceded that meeting, the episode could fairly be viewed by the jury as satisfying the receipt element of both of the substantive counts on which Murphy was convicted, unlawful gratuity and conflict of interest.[34] Criden and Thompson had developed an arrangement whereby money would be transferred by the sheik's representative without the necessity for Thompson physically to handle the briefcase in the presence of Amoroso and Weinberg. Using guarded conversation, Thompson and Criden would say only enough to satisfy the sheik's representatives that Thompson was acknowledging receipt of money. The arrangement, carried out on the evening of October 9, ended with Amoroso indicating the briefcase and Thompson saying to Criden, "You look after that for me will you?" Thompson then recruited Murphy, and the jury was entitled to infer, from the sequence of events and what they saw on videotape, that at the October 20 meeting Criden and Murphy were following the same arrangement previously employed by Criden and Thompson. There was just enough conversation about money to reassure the sheik's representatives that Murphy was acknowledging his awareness of a payment. Amoroso then moved the briefcase toward the couch where Murphy and Criden were seated, Criden said, "Why don't you give that to Jack?", and Murphy replied, "Howard why don't you take care of that."

This evidence entitled the jury to find that Murphy had at that point received the money. Having struck an agreement to accept money in return for assistance with the immigration matter,[35] Murphy was in constructive possession of the money in the briefcase when he exercised the authority to direct that Criden should take physical possession of it. An illegal payment is sufficiently received when the person who has agreed to receive it directs that it be held by his "bag man."[36] The evidence also permitted the jury to find that Murphy received the money for his own benefit. The contrary inference, that he was agreeing to use his congressional influence in order to confer a benefit solely upon Criden, is utterly implausible.

■ 4. *Evidentiary Rulings.* Thompson contends that the videotaping of his conversations with the undercover agents violated rights protected by the Fourth Amendment and, because he was a Congressman, also violated the First Amendment and the doctrine of separation of powers. The claim was not asserted at trial by a timely motion to suppress, *see United States v. Mauro,* 507 F.2d 802 (2d Cir. 1974), *cert. denied,* 420 U.S. 991, 95 S.Ct. 1426, 43 L.Ed.2d 672 (1975), and, in any event, is without merit. Thompson's conversations with undercover agents in whom he chose to confide were not privileged, and mechanical recordings of the sights and sounds to which the agents could have testified were proper evidence. *See United States v. White,* 401 U.S. 745, 749–53, 91 S.Ct. 1122, 1124–26, 28 L.Ed.2d 453 (1971); *Lopez v. United States,* 373 U.S. 427, 437–40, 83 S.Ct. 1381, 1387–1388, 10 L.Ed.2d 462 (1963); 18 U.S.C. § 2511(2)(c). Since the tapes con-

---

**34.** As previously indicated, *supra* note 24, we are willing to assume, for the sake of argument, that both section 201(g) and section 203(a) require not only receipt of money but also receipt for the benefit of the defendant. In his initial instruction to the jury, Judge Pratt had explained that the "receipt" element of the bribery offense, section 201(c), required receipt for the benefit of the defendant and then stated, "This is a common element, either directly or indirectly, . . . in all of the substantive counts."

**35.** Though the jury was apparently not sufficiently persuaded that Murphy had agreed to take official action to convict him of bribery, they were entitled to use his statements indicating agreement as evidence of the context in which the handling of the briefcase was to be assessed for purposes of determining receipt.

**36.** The Government correctly points out that simply an agreement to receive money, rather than actual receipt, would violate section 201(g) and section 203. However, Judge Pratt instructed the jury that receipt was required.

tained material evidence of criminal violations, they were not immunized by the circumstance that Thompson was a Congressman at the time the conversations occurred. *Cf. United States v. Nixon,* 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

Thompson claims that the Speech or Debate Clause bars the introduction into evidence of his private conversations with Congressman Murtha on the floor of the House of Representatives, in which he invited Murtha to join the ranks of those accepting bribes. One would think that a Congressman, even when grasping for objections to a criminal conviction, would understand that the Speech or Debate Clause accords immunity to what is said on the House floor in the course of the legislative process, *Gravel v. United States, supra,* not to whispered solicitations to commit a crime.

### Conclusion

In considering the myriad issues raised by these seven appellants, we are not passing judgment on the wisdom of the Abscam investigation, nor on whether the means by which it was conducted conformed to internal administrative standards of the Department of Justice or to other standards that the Executive Branch might choose to adopt or the Legislative Branch might require. Our task is to determine whether the methods employed and the conduct of the ensuing trials render the resulting convictions invalid under the Constitution and laws of the United States or whether they present one of those rare occasions when we are authorized to vacate convictions in the exercise of a limited supervisory power over the administration of federal criminal justice.

The four Congressmen were caught on videotape in the very act of committing federal crimes. There was sufficient evidence of their guilt and that of the other defendants. The conduct of the investigation, though subject to some criticism, affords no basis for rejecting the convictions.

The pretrial proceedings conducted by Judge Mishler and the trial and post-trial hearings conducted by Judge Pratt were vigorous contests marked throughout by the fairness, patience, and thoroughness of the District Judges. We have carefully considered all of the appellants' claims, including those not discussed in this opinion, and, with the exception of the attack upon the charge as to section 203(a) in the *Thompson-Murphy* trial, we find them all to be without merit, both for the reasons we have set forth and for the further reasons detailed in Judge Pratt's comprehensive opinion denying post-trial motions in the District Court. 527 F.Supp. 1206. We reverse only the conviction of John Murphy on Count Three of the indictment in No. 81–1346,[37] which we remand for a new trial, and in all other respects all the judgments appealed from are affirmed.

### On Petition for Rehearing

On petition for rehearing, Thompson contends, among other things, that the words he spoke to Criden at the evening meeting at the W Street house on October 9, 1979, were "You look at that for me will you?" and not "You look after that for me will you?" as reflected in the panel's opinion and in the Government's version of the videotape transcript given to the jury. At the request of Thompson's counsel we viewed the videotape of this meeting. After viewing and hearing the videotape we cannot be certain whether the disputed word was "at" or "after." If we give the defendant the benefit of the doubt, this would surely have aided his argument to the jury that he thought the briefcase transferred at the meeting contained investment documents (to be looked at) rather than money (to be looked after). But this interpretation of the videotape would not alter the sufficiency of the evidence on which the jury convicted nor our assessment of the investigation for purposes of rejecting the due process challenges.

On the contrary, viewing the videotape reenforces our conclusion that the events at the evening meeting on October 9 reflect a

---

**37.** The practical consequence is to reduce Murphy's aggregate fine from $20,000 to $10,000.

contrived arrangement whereby $50,000 was transferred pursuant to Thompson's ground rule, explained earlier in the day by Criden to Amoroso and Weinberg, that money was not to be discussed. At the very start of the meeting, Criden says, "Frank understands the situation." Criden then ceremoniously lifts the briefcase from a table to his right and places it between himself and Thompson without any conversation by anyone concerning the briefcase or its contents. Amoroso says, "There's the briefcase," pointing to it. Thompson then says to Criden, "You look at that for me will you?" The visual impact is of people handling and talking about a briefcase containing something of importance, not simply drafts of documents for a lawyer's perusal. Thompson's knowledge that the briefcase contained money is supported by several circumstances. Later in the conversation Amoroso said the morning conversation had been "shadow boxing," to which Thompson replied, "Well, you have to be careful." The next day Criden told Cook that he had handed Thompson $20,000 of the $50,000 in the briefcase. Still later Thompson told Congressman Murtha that there would be $50,000 in "walking around money" for Congressmen willing to help.

The petition for rehearing is denied.